[No. A090293. First Dist., Div. Five. Aug. 30, 2001.]

In re the Marriage of PATRICIA L. and JOSEPH A. DESTEIN, JR.
PATRICIA L. DESTEIN, Respondent, v.
JOSEPH A. DESTEIN, JR., Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, part II of this opinion is not certified for publication.

**COUNSEL**

Kathryn Ballentine Shepherd; Fancher & Wickland and Paige Leslie Wickland for Appellant.

Renee Chernus; Law Offices of Bernard N. Wolf and Bernard N. Wolf for Respondent.

**OPINION**

**SIMONS, J.**—In this marital dissolution action, appellant Joseph A. Destein, Jr., challenges the amount of guideline child support awarded. In

significant part, the court derived the award by imputing a rate of return to appellant's separate property real estate, which was non-income-producing. Appellant contends the trial court erred principally because it had no discretion to impute income to non-income-producing investment assets. Because of the strong public interest in ensuring adequate financial support for children by their parents, we reject appellant's request to graft this exception onto a statute whose clear text imposes no limitation on the court's discretion to impute income when in the child's best interests. We affirm the decision of the trial court.

## PROCEDURAL HISTORY

Joseph and Patricia L. Destein[1] are the parents of four minor children. Patricia petitioned for dissolution of the marriage in April 1999, and by August 1999 the parties had entered into a marital settlement agreement that resolved issues of child custody, spousal support, and division of community property. Left unresolved was the issue of child support, and in September 1999 Patricia filed a motion for child support, requesting $5,000 per month, later changed to $4,300 "so that the children can enjoy a substantially similar life style in my home as they do in Joseph's home." In his response, Joseph asked the court to order Patricia to pay child support of $2,496 per month. On December 16, 1999, a final judgment of dissolution was entered, and five days later the trial court conducted a hearing on Patricia's motion for child support. Ultimately, in January 2000 the trial court issued a tentative decision awarding Patricia $2,835 per month. A formal order was filed in February. Joseph appeals from that postjudgment order.

## FACTS

Throughout the marriage the parties and their children enjoyed a lavish lifestyle "that allowed for expensive clothing, vacations, camps and private schooling." They lived with a full-time housekeeper in a 4,500-square-foot home in San Anselmo that sold in 1999 for $1.2 million. The household expenses averaged approximately $14,000 per month.

At the beginning of the marriage Joseph was 40 years old and retired. He had owned two successful risk management businesses, which he sold in 1982 for over $2 million. With his separate property funds he purchased real property in Nicasio and made other investments in securities. The Nicasio property generated no income.

According to Joseph, the couple's relationship was in "a state of deterioration for many years." They separated twice (from 1987 to 1990 and in

---

[1]For the sake of simplicity and without intending any disrespect, we will refer to the parties by their first names.

1996) and reconciled. During the second separation, the parties devoted substantial energy to reaching an economic settlement, before reconciling.

In 1998 Joseph sold the Nicasio property at a profit of over $1.5 million and acquired several other real properties in a like-kind tax-deferred exchange. Only one of the new properties, the Calplans-Wood vineyard, generated any income; in 1999 Joseph received about $30,000 as rental income. The other properties were designed for long-term appreciation and included a vineyard that generated no income, two dilapidated commercial buildings in need of restoration, two pieces of raw land, and an office building used in part by Joseph as his own office, with the remainder rented out to cover expenses.

During the marriage, Joseph was not gainfully employed. He used the income from his investments to support his family and to pursue his interests in screenwriting and filmmaking, from which he derived no income. Joseph was also a syndicate member of Lloyd's of London from which he received some passive income; in 1999 he received a cash distribution of $54,000. As Patricia explained in her supporting declaration, the parties did not rely on Joseph's minimal income for their living expenses. They relied on Joseph's "substantial wealth and property."

In his income and expense declaration, Joseph listed assets totaling over $6 million, including stocks, bonds and other securities ($1.2 million), retirement accounts ($1.2 million), and real estate ($3.7 million, including his personal residence valued at $1.2 million). He listed his monthly expenses at $14,488 with an annual income of only $65,555.[2]

Patricia worked part-time throughout the marriage as a compliance consultant for a stock brokerage firm. In 1998 she earned about $50,000. After separation she increased her hours, and in 1999 her income rose to $60,000. In her supporting declaration, Patricia asserted that her income was not sufficient to maintain the standard of living the children had enjoyed during the marriage.

### The Accountant's Report

An accountant retained by Patricia for purposes of the child support proceeding evaluated Joseph's assets and concluded that Joseph's annual income should be deemed to be $328,066. The accountant based this figure

---

[2] Joseph computed this income figure by taking his gross income of $124,516 from his securities investments and adjusting it downward for real estate losses of $58,961 ($85,961 expenses less $27,000 rental income).

in part on Joseph's 1998 income of $70,000 from Lloyd's of London plus $30,000 rental income from the Calplans-Wood vineyard. The accountant also calculated that Joseph had available $1.2 million in a retirement account that could be withdrawn. For the most part, however, the accountant's determination of Joseph's ability to earn income was based on an estimated return of 6 percent from Joseph's investments. Those investments included just over $1 million in stocks, bonds, and other securities and $2.5 million in real estate (excluding his residence).[3]

As to the real estate, the accountant acknowledged that, except for the Calplans-Wood vineyard, none of the properties generated income and most were being renovated requiring a significant outlay of cash. The accountant estimated the investment value of the real properties by using the price Joseph had paid for the properties the year before, deducting the mortgage obligations, costs of sale, and the tax effects, and arriving at a liquidation value for the properties of $1.4 million that could be invested and yield an estimated 6 percent return.

### The Trial Court's Decision

The trial court awarded Patricia child support in the amount of $2,835 per month, finding this level of support "in keeping with the lifestyle enjoyed by the family during the marriage." In calculating this amount, the court found that income of $229,956 should be attributed to Joseph—less than what the accountant computed. Unlike the accountant, the court did not use any income from Joseph's retirement plans, reasoning that Joseph was only 58 and ineligible to receive distributions before age 59½. The court also used Joseph's actual income of $30,000 from the Calplans-Wood vineyard plus $54,000 from Lloyd's of London, not the $70,000 used by the accountant. Otherwise, however, the court followed the accountant's calculations and imputed income to Joseph of $145,950 based on an estimated return of 6 percent on Joseph's combined real estate and securities investments.

### DISCUSSION

### I. Imputing Income

 On appeal, Joseph argues that the trial court erred in imputing to him a hypothetical rate of return on his real estate investments when those investments do not produce income and would need to be liquidated to do

---

[3]Patricia has never sought to impute a rate of return to Joseph's equity in his home. Thus the question of what circumstances might justify a trial court's decision to do so is not before us.

so. Joseph asserts that the trial court had no authority to enforce a particular investment strategy and should have based the child support calculation on his actual income of $65,555. Joseph misunderstands the court's order and underestimates its discretion to rely on earning capacity; we reject his argument.

## A. *The Earning Capacity Doctrine*

We begin with the observation that the statewide uniform guidelines for determining child support rest upon important principles, including (1) "[a] parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life"; (2) "[b]oth parents are mutually responsible for the support of their children"; (3) "[e]ach parent should pay for the support of the children according to his or her ability"; (4) "[t]he guideline seeks to place the interests of children as the state's top priority"; (5) "[c]hildren should share in the standard of living of both parents. Child support may therefore appropriately improve the standard of living of the custodial household to improve the lives of the children"; and (6) "[c]hild support orders in cases in which both parents have high levels of responsibility for the children should reflect the increased costs of raising the children in two homes and should minimize significant disparities in the children's living standards in the two homes." (Fam. Code, § 4053, subds. (a), (b) & (d)-(g).)

A crucial component for determining the amount of child support is, of course, each parent's income. (Fam. Code, §§ 4055, 4059.) "Income," itself, is broadly defined: "The annual gross income of each parent means income from whatever source derived . . . ." (Fam. Code, § 4058, subd. (a).) Moreover, the court is not limited to the parent's actual income. "The court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children." (Fam. Code, § 4058, subd. (b).)

The strong public policy in favor of providing adequate child support has led to an expansive use of the earning capacity doctrine in setting the level of support when consistent with the needs of the child. (*In re Marriage of Regnery* (1989) 214 Cal.App.3d 1367, 1372 [263 Cal.Rptr. 243].) "Historically, California courts limited consideration of a parent's earning capacity (in lieu of actual income) to the narrow situation where the record demonstrated the parent was *deliberately shirking family financial responsibilities* by intentionally suppressing income or refusing to accept or seek gainful employment . . . ." (1 Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2001) ¶ 6:427, pp. 6-174 to 6-175 (rev. #1,

2000), italics in original; *Philbin v. Philbin* (1971) 19 Cal.App.3d 115, 119, 121 [96 Cal.Rptr. 408].) *Philbin's* discussion of the ability to earn and the bad faith requirement preceded any statutory authorization for the concept. Currently, Family Code section 4058 expressly authorizes the court to attribute income, without regard to deliberate attempts to reduce income. The *Philbin* rule failed to survive the enactment of Family Code section 4058. (*In re Marriage of Hinman* (1997) 55 Cal.App.4th 988 [64 Cal.Rptr.2d 383]; *In re Marriage of Padilla* (1995) 38 Cal.App.4th 1212 [45 Cal.Rptr.2d 555].)

In *Padilla* the supporting party resigned his job to open his own business, with the goal of increasing earnings. The trial court imputed income after specifically finding no bad faith motive in respondent's actions. On appeal, the court upheld that decision. "Statutory commands and the inherent responsibility parents owe their children lead us to conclude the bad faith rule, as applied to child support . . . can no longer be supported. Once persons become parents, their desires for self-realization, self-fulfillment, personal job satisfaction, and other commendable goals must be considered in context of their responsibilities to provide for their children's reasonable needs. If they decide they wish to lead a simpler life, change professions or start a business, they may do so, but only when they satisfy their primary responsibility: providing for the adequate and reasonable needs of their children." (*In re Marriage of Padilla, supra,* 38 Cal.App.4th at p. 1220, fn. omitted.)

With the demise of the bad faith limitation, parties have suggested other per se rules to limit application of the earning capacity doctrine to determine the level of child support. Each has been rejected. So long as a parent has an earning capacity, that is, the ability and the opportunity to earn income, the trial court may attribute income. (*In re Marriage of Regnery, supra,* 214 Cal.App.3d at p. 1372.) For example, in *In re Marriage of LaBass & Munsee* (1997) 56 Cal.App.4th 1331, 1340 [66 Cal.Rptr.2d 393], the court rejected the supported party's argument that "for policy reasons, women who have primary custody of the children should never be subject to the income imputation provisions of [Family Code] section 4058 [subdivision] (b)." In *In re Marriage of Hinman, supra,* 55 Cal.App.4th at page 999, the court refused to adopt "a per se rule prohibiting the imputation of income to parents who refrain from employment in order to care for preschool-age children." In *In re Marriage of Dacumos* (1999) 76 Cal.App.4th 150, 153-154 [90 Cal.Rptr.2d 159], the supporting party argued that it was an abuse of discretion to impute income to certain income-producing rental properties, because " 'earning capacity' is limited to income derived from employment and does not include imputed rental income." The court rejected this contention. Noting that income is broadly defined without regard to its source

(Fam. Code, § 4058, subd. (a)), the court applied the earning capacity doctrine to the ability to earn from capital as well as labor. (See also *County of Kern v. Castle* (1999) 75 Cal.App.4th 1442, 1455 [89 Cal.Rptr.2d 874] [earning capacity applied when father spent entire $240,000 inheritance and failed to invest it].)

In each of these cases, the court did not minimize the concerns of the party opposing imputation. It simply rejected the contention that per se barriers should be erected in favor of designating the issues as legitimate factors for the court to consider in exercising its discretion.

This brief history provides context to the California Supreme Court's most recent comment on the reliance on evidence of earning capacity in child support cases: "We . . . decline to read into Family Code section 4058, subdivision (b), any limitation on the discretion vested in the trial court to consider earning capacity in determining the appropriate amount of child support when doing so would be in the child's best interests." (*Moss v. Superior Court* (1998) 17 Cal.4th 396, 424 [71 Cal.Rptr.2d 215, 950 P.2d 59]; see *In re Marriage of Simpson* (1992) 4 Cal.4th 225, 233 [14 Cal.Rptr.2d 411, 841 P.2d 931].)

## B. *Imputing Income to Joseph's Real Estate Investments*

In this case, the trial court imputed a rate of return to certain non-income-producing real estate assets, which were Joseph's separate property. A trial court's decision to impute income to a parent for child support purposes based on the parent's earning capacity is reviewed under the abuse of discretion standard. (*State of Oregon v. Vargas* (1999) 70 Cal.App.4th 1123, 1126 [83 Cal.Rptr.2d 229]; *In re Marriage of Hinman, supra,* 55 Cal.App.4th at pp. 994, 999; see *In re Marriage of Simpson, supra,* 4 Cal.4th at p. 234.) "Under this standard, '[t]he appellate court should not substitute its own judgment for that of the trial court; it should determine only if any judge reasonably could have made such an order. [Citation.]' [Citation.]" (*In re Marriage of Hinman, supra,* at p. 994.)

Joseph argues that the court abused its discretion because it was not entitled to impute investment earnings to "historically" non-income-producing assets. We reject this effort to create a per se rule. First, the test Joseph would have us apply is neither workable nor logical. The facts in this case show the impracticality of a per se rule keyed to "history." The real estate at issue was obtained by Joseph in 1998, only months before the parties separated, though long after problems had developed in the marriage which had focused the parties' attention on the economic effects of a dissolution.

The 1998 transaction was a like-kind tax-deferred exchange, in which the asset exchanged for this real estate was purchased by Joseph before marriage and never produced income. Which history is relevant? Under Joseph's proposed rule may the owner argue, as he has, that the investment has produced no income for the entire marriage or only that it has produced no income since it was obtained? How lengthy a holding period is necessary before the asset is immune from imputation? Merely posing these questions demonstrates the difficulty of articulating or implementing a per se rule and the wisdom of treating an asset's income-producing history as a factor to be considered, not a barrier to the exercise of discretion.

It is axiomatic that divorce unsettles many of the parties' significant plans and assumptions, no matter how carefully crafted during the marriage. The court's role is particularly dramatic in the child support area, where it is driven by the knowledge that the costs of supporting two households greatly exceed those of one. The Legislature has directed that "[c]hild support orders in cases in which both parents have high levels of responsibility for the children should reflect the increased costs of raising the children in two homes . . . ." (Fam. Code, § 4053, subd. (g).) Thus, the joint decision during marriage that one spouse will remain home and not earn income will not *bar* the court from ordering job training, job placement or vocational rehabilitation, so that, postseparation, the non-income-producing parent can contribute to the support of the children. (Fam. Code, § 3558.) In this light, it is difficult to credit Joseph's argument that a court lacks discretion to impute income to an asset because, during the history of the marriage, it did not produce income.

Finally, the combination of the broad statutory grant of discretion in the earning capacity statute and the strong policy directives in favor of providing adequate support to children compel rejection of this per se rule. Nothing in Family Code section 4058, subdivision (b), suggests that the court's discretion to charge a reasonable rate of return to an investment asset depends on an income-producing history. A parent's primary obligation is to support his or her children according to the parent's station in life and ability to pay. (Fam. Code, § 4053, subds. (a) & (d).) The only statutory limitation on the court's discretion to apply the earning capacity doctrine to investment assets is the best interests of the child. (Fam. Code, § 4058, subd. (b).)

In a related argument, Joseph contends that the trial court was not entitled to second-guess his reasonable investment strategy. For the entire duration of the marriage, Joseph successfully devoted the bulk of his separate property investments to growth, not income. The trial court must, he suggests, *defer* to that reasonable investment approach. Again, we disagree. When

attributing income to underearning parents, the courts must *consider*, but not always defer to, the reasonable, good faith employment choices made. It is not only unwise or unreasonable employment decisions which trigger court reliance on earning capacity. (*In re Marriage of Hinman, supra,* 55 Cal.App.4th at pp. 998-999; 1 Hogoboom & King, Cal. Practice Guide: Family Law, *supra,* ¶ 6:441, pp. 6-178 to 6-179 (rev. #1, 2000).) No good reason exists for adopting a different approach when imputing income to investment assets.

Cases arising in other jurisdictions support the conclusion that the historic allocation of assets to growth, rather than income, does not preclude attribution of income to them. In *Kay v. Kay* (1975) 37 N.Y.2d 632, 637 [376 N.Y.S.2d 443, 447, 339 N.E.2d 143, 146], the husband held substantial investments in real estate and securities which produced limited income. Drawing an analogy to cases in which the husband was capable of earning more in employment, the New York Court of Appeals held that the husband "may be required to make his considerable assets earn income which, by an objective standard, is commensurate with at least a conservative estimate of what they are capable of producing, and, when he fails to do so, he may be treated as though he had; his decision to let them grow for his own future benefit is not one which the courts are obliged to honor in all circumstances. The husband is not required to finance his alimony and support payments in precisely this fashion if he is able to meet them by other means, but we note that he may not place such a possible source of income 'off limits' here, as he argued he may do." (See also Annot., Support Awards—Imputing Income (1989) 70 A.L.R.4th 173, 236, § 12 ["Maintenance of assets in low yield form," and cases cited].)

*Kay v. Kay* disposes of Joseph's assertion that the trial court's child support award somehow compels him to liquidate his real estate holdings and convert them to income-producing assets. In actuality, the trial court merely calculated Joseph's ability to earn additional income based upon the assets available to him. Joseph is free to use whatever resources he chooses to meet his support obligations. In addition to his real estate investments, Joseph has over $1 million in securities from which he earns over $10,000 per month, postseparation. He currently has expenses in excess of $85,000 a year for his real estate investments and utilizes rent-free office space in one of his buildings. While Joseph may choose to pay the support award by converting his real estate investments, he has other evident alternatives.

Joseph argues that the trial court abused its discretion by imputing income when there had been no change in the earnings, postseparation. This argument is wrong both on the facts and the law. The claim that there has been

no reduction in income is belied by documents Joseph provided in response to the support motion filed by Patricia in September 1999. His 1998 gross income, prior to subtracting his real estate expenses, was approximately $212,000, or nearly $18,000 per month. The parties separated in April 1999. Joseph's gross income in October 1999 (as well as during the 12 months through October 1999) was $10,000 per month. If one takes into account the real estate expenses, monthly gross income for each of these relevant time periods is halved. The parties approximated monthly expenses at $14,000, a figure consistent with Joseph's preseparation, but not postseparation, earnings. Without implying any particular reason for the decline, we observe Joseph's own figures demonstrate that his income fell precipitously, postseparation.

In addition, although it is true that earning capacity has primarily been applied when a parent reduced his or her income postseparation, it is not limited to a parent's deliberate avoidance of his support obligations. (*In re Marriage of Hinman, supra,* 55 Cal.App.4th at pp. 995-999, and cases cited therein; see *State of Oregon v. Vargas, supra,* 70 Cal.App.4th at p. 1126.) A reduction in a parent's income may provide the impetus for the other parent to challenge the payor parent's income. However, the earning capacity doctrine is not restricted to cases of diminished income. As we noted above, our Supreme Court has refused to read any limitation into a trial court's discretion to impute income when in the child's best interests. (*Moss v. Superior Court, supra,* 17 Cal.4th at p. 424; *In re Marriage of Simpson, supra,* 4 Cal.4th at p. 233.)

Thus trial courts have discretion to attribute income to investment assets. We do not conclude, however, that this discretion must invariably be exercised in favor of creating income where none, in fact, exists. The decision to impute rests on an analysis that is particularly fact intensive. Factors which do not eliminate discretion may significantly affect whether it should be exercised.

In our case, the court was required to consider the non-income-producing history of the assets, the length of time they were owned by Joseph, and their purchase in a like-kind exchange. The record, however, also permitted the court to conclude that Joseph's income had declined substantially postseparation; sizeable income, which could be devoted to child support, was, instead, utilized to cover the expenses for non-income-producing real estate; Joseph dedicated considerable time and effort to managing his very successful real estate holdings, for which he received no pay; income from his real estate was reduced to provide him with an office; to cover household expenses, he drew down on capital; and a market for the real estate existed.

Further, after imputing a rate of return, the court found that Joseph's monthly gross income for child support purposes was approximately $19,000, virtually the same as his preseparation gross income, without the deduction for real estate expenses. Finally, the court could properly determine that, postseparation, the children enjoyed a substantially lower living standard when residing with Patricia than during the marriage, and a significant disparity existed between the children's lifestyle at the home of each parent.

After a careful consideration of these factors, the trial court addressed this difference in living standards by accepting part of the expert's recommendation and imputing income from Joseph's real estate investments.[4] In the factual context of this case, we find no abuse of discretion in this decision.

C. *Calculating a Rate of Return*

Relying on *In re Marriage of Cohn* (1998) 65 Cal.App.4th 923, 930-931 [76 Cal.Rptr.2d 866], Joseph contends the evidence is insufficient to support the trial court's finding that he has the ability to earn $145,950 from his non-income-producing investments. In *Cohn,* the father was an attorney who had unsuccessfully attempted a solo practice and had been unable to obtain employment. The trial court imputed income to the father of $40,000 per year. On appeal, the court upheld the trial court's decision to rely on the father's earning capacity, agreeing that he had the ability and opportunity to earn income. However, the appellate court reversed for insufficient evidence to support the finding as to the amount of income imputed: "[F]igures for earning capacity cannot be drawn from thin air; they must have some tangible evidentiary foundation." (*Id.* at p. 931.)

The present case is obviously distinguishable. The figures used by the trial court as to the value of assets available for investment and as to the projected rate of return were supported by the uncontradicted expert opinion of Patricia's accountant. That witness provided the court with a detailed report, as well as testimony, which explained his methodology and rationale. Since almost all of the real estate was currently being renovated, actual income-producing capabilities were unknowable. As an alternative, the expert proposed, and the court accepted, a reasonable return that would be generated if Joseph's equity in these assets were invested in income-producing assets. He valued the assets at their recent acquisition cost, subtracted the costs of a hypothetical sale, including the tax consequences and applied a 6 percent

---

[4]The trial court rejected the expert's recommendation that it impute additional income to Joseph from his retirement account. Patricia has not appealed that decision, and so we are not called upon to determine under what circumstances that may occur.

investment return. His testimony that this rate of return was risk free was uncontradicted.[5] He further testified that this was a "typical approach" utilized in other cases.

In the calculation accepted by the trial court, the expert added the value of Joseph's brokerage accounts to the estimated funds available from a hypothetical liquidation of the real estate and applied a conservative, risk-free rate of return to the total. We do not find that this is the only method of determining the earning capacity for non-income-producing assets, or, even, that it is the best. It is reasonable, and so we sanction its use.

II. *Other Claims of Error**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The order for child support is affirmed. Patricia shall recover costs on appeal.

Jones, P. J., and Stevens, J., concurred.

---

[5]Patricia's accountant stated: "We use a [6] percent return because that is a return that can be realized currently through either short-term to intermediate treasury bills without any risk of loss of investment or from such things as medium-range timed certificates of deposit. [¶] So, to use a higher rate, perhaps [8, 9, or 10] percent, while it may be achievable . . . it contains a component of risk. So we look to minimize the return that can be associated with these investable assets to a level of return that, in effect, would not be subject to some underlying loss in the investment itself while it's generating a return."

*See footnote, *ante,* page 1385.