Filed 11/30/15  Marriage of Walther CA2/6

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re Marriage of KIRA and HOWARD WALTHER. | 2d Civil No. B260104 (Super. Ct. No. 1440375 No. 1440419) (Santa Barbara County) |
| HOWARD WALTHER,  Petitioner and Appellant. v. KIRA WALTHER,          Respondent, | |

Howard Walther (husband) appeals from an order requiring him to pay temporary child and spousal support.  "A temporary support order is operative from the time of pronouncement, and it is directly appealable.  [Citation.]"  (*In re Marriage of Gruen* (2011) 191 Cal.App.4th 627, 637.)  Husband contends that the trial court erroneously (1) imputed income to him from non-income-producing real properties, including his residence; (2) assumed that he was the sole owner of his residence; (3) applied a three-percent rate of return to all of his assets; and (4) failed to determine the liquidation value of his real properties pursuant to a method approved by case law.  Only the third contention has merit.  We reverse and remand with directions to conduct an evidentiary hearing solely to determine an appropriate rate of return on husband's assets.

1

## Factual and Procedural Background

The parties married in February 1998 and separated in February 2014. They have two children: one born in 2003 and the other in 2009. In March 2014 respondent Kira Walther (wife) filed a petition for dissolution of the marriage. She requested temporary child and spousal support. An evidentiary hearing was conducted on her request.

One of the exhibits at the hearing (Exhibit 9) was a Department of Homeland Security "Affidavit of Support" that husband had signed in December 2012. The purpose of the affidavit was to obtain approval of wife's parents' application for visitor visas to the United States. Husband declared under penalty of perjury that he had $205,714 in a savings account and owned five stock accounts worth $996,507. He valued the equity in his Santa Barbara residence at $1,200,000. He also owned three properties in Arizona. He valued the equity in the three properties at $130,000, $110,000, and $140,000. The total value of his equity in the real estate, savings account, and stock accounts was $2,782,221.

Husband's 2013 federal income tax return (Exhibit 106) shows that he was receiving rental income from each of the three Arizona properties. The tax return also shows that he owned two additional properties in Tucson, Arizona that were not rented. Husband testified that these two properties were unimproved "residential type lots." He was paying mortgage interest on only one of the five Arizona properties.

Exhibit 10 was husband's April 2014 Income and Expense Declaration. Husband declared that he had no earnings. Based on his 2013 income tax return, his monthly dividend/interest income was $1,763 and his monthly rental income was $1,069. He had cash of $53,660. He valued his liquid assets, including stocks and bonds, at $1,230,840. His remaining property was real estate, which he valued at $1,183,000. The total value of all of his assets was $2,467,500. His average monthly expenses were $3,507.

Husband testified that, in addition to his residence and the five Arizona properties, he owned 62 acres of unimproved land in Buellton, California. From July 2010 to November 2012, he had unsuccessfully listed the land for sale with a broker. The original price was $565,000, but he later reduced it to $535,000.

2

The evidentiary hearing concluded on May 1, 2014, and the court took the matter under submission. That same day, wife filed a request for judicial notice of long-term rates on Treasury securities. The request is not referred to in the court's minutes or the transcript of the oral proceedings. The record does not contain a ruling on the request. The court's statement of decision does not mention the request or long-term rates on Treasury securities. We therefore conclude that the court did not rule on the request.[1] The copy of the request in the record does not include a proof of service. In his opening brief, husband alleges that he did not object to the request because he did not know it "existed."

In its statement of decision, the court found that "[m]any of [husband's] personal expenses are paid from a joint bank account that he holds with his mother, Dorothy Walther, and this is a financial resource available to [him] above and beyond [his] financial resources from investment income and investments." The court accepted husband's representation in his Income and Expense Declaration that the value of all of his assets was $2,467,500. To this amount it applied a three-percent rate of return to yield imputed income of $6,168 monthly and $74,025 annually.

The court deviated upward from guideline child support. It ordered husband to pay temporary child support of $3,092 per month and temporary spousal support of $1,952 per month, retroactive to March 2014.

*Imputation of Income on Buellton Property*

Husband argues that, in calculating his income for child support purposes, the trial court abused its discretion in imputing income on his equity in the unimproved land he owned in Buellton. Husband reasons that "he twice listed the Buellton lot for sale, and in both instances, he received zero offers." Thus, the land was "not saleable" and "impossible to liquidate." "[W]ithout a means to extract his equity, Husband here had no ability or opportunity to earn income from [the] Buell[]ton property."

---

[1] "If the trial court denies a request to take judicial notice of any matter, the court shall at the earliest practicable time so advise the parties and indicate for the record that it has denied the request." (Evid. Code, § 456.)

3

The trial court's imputation of income on the Buellton property was based on Family Code section 4058, subdivision (b), which provides: "The court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interest of the children."[2] "This earning capacity doctrine 'embraces the ability to earn from capital as well as labor.' [Citations.]" (*In re Marriage of Schlafly* (2007) 149 Cal.App.4th 747, 754.) "[U]nder the earning capacity doctrine (§ 4058, subd. (b)) the trial court has the discretion to impute a reasonable rate of return on the supporting parent's underutilized or non-income producing investment assets in order to calculate guideline child support in the best interests of the child." (*In re Marriage of Williams* (2007) 150 Cal.App.4th 1221, 1239.)

"A trial court's decision to impute income to a parent for child support purposes based on the parent's earning capacity is reviewed under the abuse of discretion standard. [Citations.]" (*In re Marriage of Destein* (2001) 91 Cal.App.4th 1385, 1393.) Husband has the "burden of convincing this court that the trial judge exercised his discretion in an arbitrary, capricious or patently absurd manner." (*Culbertson v. R. D. Werner Co.* Inc. (1987) 190 Cal.App.3d 704, 710.)

"Nothing in . . . section 4058, subdivision (b), suggests that the court's discretion to charge a reasonable rate of return to an investment asset depends on an income-producing history. A parent's primary obligation is to support his or her children according to the parent's station in life and ability to pay. [Citation.] The only statutory limitation on the court's discretion to apply the earning capacity doctrine to investment assets is the best interests of the child. [Citation.]" (*In re Marriage of Destein*, *supra*, 91 Cal.App.4th at p. 1394.)

Husband has not shown that the trial court abused its discretion in determining that the best interests of the children would be served by charging a reasonable rate of return on the Buellton property. The property was not unsaleable and "impossible to liquidate" merely because husband had listed it for sale for more than two years without finding a

_____

[2] All statutory references are to the Family Code unless otherwise stated.

buyer. The list price may have been too high. There is no evidence that the property was rendered unsaleable because of a title defect or hazardous condition.

In a footnote husband asserts that two non-income-producing properties in Tucson, Arizona "should . . . be excluded from consideration" because he "testified it was impossible for him to sell those two lots . . . ." Because husband has "rais[ed] this point in a footnote and fail[ed] to develop the argument in [his] opening brief, we may treat this point as forfeited. [Citations.]" (*Estate of Bonzi* (2013) 216 Cal.App.4th 1085, 1106, fn. 6.) In any event, the trial court did not abuse its discretion in imputing income on husband's equity in these properties.

*Imputation of Income on Husband's Residence*

Husband contends that the trial court erred as a matter of law in imputing income on the equity in his residence. As authority for this contention, husband cites *In re Marriage of Williams*, *supra*, 150 Cal.App.4th 1221. There, the appellate court observed: "[T]he trial court may properly attribute income based on an assumed reasonable rate of return on underutilized or non-income producing investment assets. [Citations.] However, a supporting parent's home equity generally may not be considered for the purpose of calculating child support absent a showing of special circumstances under section 4057, subdivision (b), that render guideline support unjust or inappropriate. [Citation.]" The *Williams* court concluded that, because wife had not made "a showing under section 4057, subdivision (b), of special circumstances rendering guideline support unjust or inappropriate," the trial court had "erred in including a hypothetical 3 percent return on [husband's] home equity in determining [his] income for purposes of calculating guideline child support." (*Id*., at p. 1244.) The court "remand[ed] the matter for reconsideration of the child support order in light of the view expressed in this opinion that [husband's] home equity may not be considered for the purpose of calculating child support *absent a showing of special circumstances under section 4057, subdivision (b), that render guideline support unjust or inappropriate*." (*Ibid*., italics added.)

Unlike the trial court in *Williams*, the trial court here found that a showing of special circumstances rendered guideline child support unjust or inappropriate. The court

5

concluded that an upward deviation from guideline support was necessary to prevent "a substantial reduction in the standard of living for the children." The court continued: "[T]he special circumstances justifying this decision to deviate upward . . . [are] based upon the children's needs, standard of living and best interests, [husband's] assets, income on investments, reduced living expenses, access to funds for his personal use from the joint account held with [his mother], the parties' standard of living, and also [husband's nonpayment of] federal income tax due to loss carryovers." The court considered that husband had "admitted that he did not produce bank statements of joint accounts with his mother . . . and that some of his personal expenses are paid from those account(s)."

Husband has not shown that the trial court abused its discretion in determining that a showing of special circumstances rendered guideline support unjust or inappropriate. Accordingly, the court did not err in imputing income on husband's equity in his residence.

*Attribution of Ownership of the Residence to Husband*

Husband argues: "[H]alf the value of [his residence] should have been excluded [in calculating child support] since [he] only owned half . . . . Husband jointly owned the house with [his] Mother." Husband testified, "[W]hen we purchased the property originally, I'm fairly certain my mom is somehow on title and that was some time ago, I think back in 1994 and so back then, yes [his mother was on title]." That mother was on title in 1994 does not show that she was on title 20 years later when the trial court determined the amount of child support. Husband further testified that he could not recall whether he and his mother had owned the residence as joint tenants.

In December 2012 husband signed a Department of Homeland Security "Affidavit of Support" in which he declared under penalty of perjury that he, not he and his mother, owned the residence and that his equity in the property was $1,200,000. Based on husband's testimony and the affidavit, the trial court did not abuse its discretion in attributing ownership of the residence to husband.

In any event, husband forfeited the ownership issue because he did not raise it in his objections to the court's proposed statement of decision. (*Fladeboe v. Am. Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 59 ["if a party fails to bring omissions or ambiguities in the

6

statement of decision's factual findings to the trial court's attention, then 'that party waives the right to claim on appeal that the statement was deficient in these regards' "].) Husband objected that the proposed statement of decision did not provide the basis for "imputation of income on *all* of [his] assets including his primary residence." Husband did not object that the proposed statement of decision omitted to mention that "his primary residence" was actually owned in joint tenancy with his mother.

*Three-Percent Rate of Return on Husband's Assets*

In calculating husband's imputed income, the trial court applied a three-percent rate of return to all of his assets. The court stated: "A three percent rate of return has most commonly been approved by the courts. The estimate[d] dividend yield on [husband's] Morgan Stanley investment account, for example, is 3.19%, Exhibit 28." Exhibit 28 contains husband's Morgan Stanley statement for March 2014. It shows that husband owned stocks with a market value of $342,255.91 and an estimated annual yield of 3.21 percent. The total value of the account was $363,075.36 with an estimated annual yield of 3.03%.

Husband contends that the evidence is insufficient to support a three-percent rate of return. He points out that there was no expert testimony on the appropriate rate of return. On the other hand, in *In re Marriage of Destein*, *supra*, 91 Cal.App.4th at p. 1397, the appellate court noted, "The figures used by the trial court as to the . . . projected rate of return were supported by the uncontradicted expert opinion of [wife's] accountant." As to his Morgan Stanley account, husband asserts: "[T]he stocks . . . were high-risk international stocks. While the dividend may be higher, so was the risk. This court cannot expect Husband to divest all his assets and invest them all in a high-risk portfolio."

A similar issue was before the appellate court in *In re Marriage of Schlafly, supra,* 149 Cal.App.4th 747. There, husband contested the trial court's "imputation of a 3 percent rate of return on his stock market portfolio." (*Id*., at p. 754.) The portfolio paid annual dividends of about 1.6 percent. The trial court "explained that the 3 percent figure was a more accurate reflection on the value of the assets; unless [husband] was earning at least 3

7

percent annually in the stock market, he [c]ould invest in bonds and be guaranteed a 3 percent return." (*Id.*, at p. 755.)

The appellate court observed that husband "rightly contends, 'figures for earning capacity cannot be drawn from thin air; they must have some tangible evidentiary foundation.' [Citation.]" (*In re Marriage of Schlafly, supra*, 149 Cal.App.4th at p. 756, quoting from *In re Marriage of Cohn* (1998) 65 Cal.App.4th 923, 931.) The court found that there was "ample support" for the 3 percent rate of return. (*Ibid.*) It stated: "[T]he [trial] court explained that 3 percent represents the minimum anticipated return on investment for bonds or certificates of deposit. [Husband] did not contest the assumption that 3 percent was a reasonable rate of return for these types of investments, just that they were not his preferred forms of investment; in fact, [husband] acknowledged that certificates of deposit and some bonds would pay three percent. We therefore find that the application of a 3 percent rate of return—an estimate that is supported by common knowledge and common sense—is supported by substantial evidence." (*Ibid.*)

*Schafly* is distinguishable. Unlike the husband in *Schafly*, husband here did not acquiesce in the assumption that 3 percent was a reasonable rate of return on bonds or certificates of deposit. Husband objected to the proposed statement of decision on the ground that "[t]here is no evidence to support the Court's application of a 3% rate of return on [his] assets for purposes of calculating support." Husband protested that there is no "evidence of what a reasonable rate of return on [his] assets is under current economic circumstances."

*Schafly* is also distinguishable because it is common knowledge that interest rates on September 2, 2014, when the trial court in the instant case signed the support order, were much lower than they were on December 20, 2005, when the trial court in *Schafly* made its support order. They were also much lower than they were on April 10, 2007, when the appellate court in *Schafly* filed its opinion. The precipitous decline in interest rates resulted from the "Great Recession" of 2008-2009 and the Federal Reserve's policy of quantitative easing. Pursuant to Evidence Code sections 452, subdivision (h), and 459, we take judicial notice that on December 20, 2005, the Treasury Yield Curve Rate, also referred to as the

8

Constant Maturity Treasury Rate, was as follows: 5-year maturity - 4.40 percent; 7-year maturity - 4.41 percent; 10-year maturity - 4.47 percent; and 20-year maturity - 4.74 percent.[3] We also take judicial notice that on September 2, 2014, the Treasury Yield Curve Rate had plummeted: 5-year maturity - 1.69 percent; 7-year maturity - 2.11 percent; 10-year maturity - 2.42 percent; and 20-year maturity - 2.91 percent.[4] In addition, we take judicial notice that on September 2, 2014, the national annual rate on "jumbo" certificates of deposit (greater or equal to $100,000) was .62 percent for a 48-month term and .79 percent for a 60-month term.[5] Thus, unlike the trial court in *Schafly*, the trial court here could not have said "that 3 percent represents the minimum anticipated return on investment for bonds or certificates of deposit." (*In re Marriage of Schlafly*, *supra*, 149 Cal.App.4th at p. 756.)

In view of the precipitous decline in interest rates and husband's objection to a three-percent rate of return, we cannot conclude that a three-percent rate of return on all of husband's assets is supported by "common knowledge and common sense" as well as by substantial evidence. (*In re Marriage of Schlafly, supra,* 149 Cal.App.4th at p. 756.) In *In re Marriage of Williams*, *supra*, 150 Cal.App.4th at p. 1240, the trial court applied a three-percent rate of return to the husband's brokerage account and equity in his residence, but he did "not challenge the selection of 3 percent as a reasonable rate of return." The *Williams* opinion was filed on May 17, 2007, also before the onset of the "Great Recession." Because the three-percent rate of return in the instant case is not supported by substantial evidence, the trial court abused its discretion. (*Palmer v. Superior Court* (2014) 231 Cal.App.4th

---

[3] See http://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/TextView.aspx?data=yieldYear&year=2005.

[4] See http://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/TextView.aspx?data=yieldYear&year=2014.

[5] See https://www.fdic.gov/regulations/resources/rates/historical/2014-09-02.html. According to the Federal Deposit Insurance Corporation, "[n]ational rates are calculated based on a simple average of rates paid (uses annual percentage yield) by all insured depository institutions and branches for which data are available." (See fn. 1 at https://www.fdic.gov/regulations/resources/rates/.)

1214, 1224 ["A trial court abuses its discretion when . . . its factual findings are not supported by substantial evidence"].)

*Liquidation Value of Real Properties*

Husband argues that the trial court abused its discretion because it did not impute income to his real properties based on their liquidation value as determined pursuant to the method approved in *In re Marriage of Destein*, *supra*, 91 Cal.App.4th 1385. There, wife's accountant arrived at a liquidation value of $1.4 million for husband's real properties "by using the price [he] had paid for the properties the year before, deducting the mortgage obligations, costs of sale, and the tax effects . . . ." (*Id*., at p. 1390.) Income was then imputed to the properties based on their liquidation value.

The trial court did not abuse its discretion because it was not required to use the *Destein* method of imputing income to husband's real properties. The *Destein* court stated: "We do not find that this is the only method of determining the earning capacity for non-income-producing assets, or, even, that it is the best. It is reasonable, and so we sanction its use." (*Id*., at p. 1398.)

In any event, the issue is forfeited because husband did not raise it in the trial court. (*In re Marriage of Arcenaeux* (1990) 51 Cal.3d 1130, 1138 ["it would be unfair to allow counsel to lull the trial court and opposing counsel into believing the statement of decision was acceptable, and thereafter to take advantage of an error on appeal although it could have been corrected at trial"]; *In re Marriage of Whealon* (1997) 53 Cal.App.4th 132, 144 ["For better or worse, California child support law now resembles determinate sentencing in the criminal law: The actual calculation required of the trial judge has been made so complicated . . . that, to conserve judicial resources, any errors must be brought to the trial court's attention at the trial level while the error can still be expeditiously corrected"].)

*Disposition*

The order of temporary child and spousal support is reversed. The matter is remanded to the trial court with directions to conduct a new evidentiary hearing solely to determine the appropriate rate of return on husband's assets in view of market conditions on September 2, 2014, when the trial court signed the statement of decision and order of

10

support.  The trial court shall apply the appropriate rate of return to the value of husband's assets ($2,467,500) and recalculate temporary child and spousal support based on the evidence before it on September 2, 2014.  The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED.


YEGAN, J.


We concur:


GILBERT, P.J.


PERREN, J.

11

James E. Herman, Judge

Superior Court County of Santa Barbara

_____

Stephen Temko, Dennis Temko, for Petitioner and Appellant

Drury Pullen, Susan *v.* Pullen, for Respondent.