[No. H028532. Sixth Dist. May 17, 2007.]

In re the Marriage of HILARY JANE and THOMAS MICHAEL WILLIAMS.
HILARY JANE WILLIAMS, Respondent, v.
THOMAS MICHAEL WILLIAMS, Appellant.

1222

**COUNSEL**

David Jay Morgan; Tarkington, O'Neill, Barrack & Chong and Robert A. Roth for Appellant.

Law Offices of Bernard N. Wolf, Bernard N. Wolf; McManis Faulkner & Morgan and Michelle Tidalgo for Respondent.

**OPINION**

**BAMATTRE-MANOUKIAN, Acting P. J.—**

## I. INTRODUCTION

In this marital dissolution action, appellant Thomas Michael Williams and respondent Hilary Jane Williams dispute the amount of child support that Thomas[1] should pay for their two children. Both parties are wealthy and unemployed. They originally stipulated that monthly employment income of $20,833 would be attributed to Thomas for the purpose of calculating child support and as a result he would pay monthly child support of $3,411. The stipulation regarding child support was entered as an order of the trial court.

Thomas subsequently moved for modification of the child support order, arguing that Hilary's changed financial circumstances justified a reduction in his child support obligation. Hilary opposed the motion and sought an

---

[1] Hereafter, we will refer to the parties by their first names for purposes of clarity and not out of disrespect. (See *Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1136, fn. 1 [97 Cal.Rptr.2d 707].)

increase in child support on the ground that their stipulation regarding Thomas's earning capacity had failed to include a return on his multimillion-dollar investments.

The trial court ruled that Thomas's earning capacity should include attribution of a reasonable return on approximately $14 million in investments (including home equity of $6 million in his Pebble Beach estate), in addition to the agreed-upon attribution of monthly employment income. Accordingly, the trial court increased the monthly child support award to $7,177.

On appeal, Thomas contends that the trial court erred in modifying the child support order because (1) income cannot be attributed to home equity absent a showing of special circumstances under Family Code section 4057, subdivision (b);[2] (2) attribution of a return on his investments was not necessary to ensure that the children's reasonable needs were met; (3) Hilary failed to establish the changed circumstances required by section 4065, subdivision (d) for modification of a stipulated child support order; and (4) insufficient income was attributed to Hilary's investments.

For reasons that we will explain, we find that the trial court erred by attributing income to Thomas's home equity in calculating guideline child support and therefore we will reverse the judgment and remand the matter to the trial court for reconsideration of the child support order.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Marital Dissolution Proceedings*

Thomas and Hilary have two children, Kirstie, age 16 and Logan, age 14.[3] Prior to 1995, the parties supported their family with earned income. In 1995, Thomas sold his company, Combinet, to Cisco Systems, Inc., and received Cisco shares valued between $65 million and $85 million. The parties subsequently acquired substantial real property, including buying and remodeling a 5,400-square-foot house in Monte Sereno as well as an 11,000-square-foot house on the Seventeen Mile Drive in Pebble Beach.

Hilary later petitioned for dissolution of marriage.[4] Many of the issues that arose in the dissolution action were resolved at a mediated settlement conference held in June 2003. At that time (and all other times relevant to this appeal) neither party was employed. Among other things, the parties

---

[2] All further statutory references are to the Family Code unless otherwise indicated.

[3] The date of the parties' marriage is not stated in the record on appeal.

[4] The date the petition for dissolution was filed is not indicated in the record on appeal.

agreed that Hilary would receive the Monte Sereno house as her separate property and Thomas would remove the mortgage. They also agreed that Thomas would receive the Pebble Beach house as his separate property and the mortgage would be his responsibility.

For the purpose of calculating child support, the parties further agreed to attribute monthly employment income of $20,833 to Thomas and $2,800 to Hilary. They also stipulated that Thomas would pay monthly child support of $3,411 per month, pursuant to a DissoMaster[5] calculation factoring in the parties' imputed monthly employment income. The parties' agreement on child support and other issues was incorporated in the judgment on reserved issues that was entered on September 11, 2003.

### B. *The Motion for Modification of Child Support*

On April 5, 2004, Thomas filed a motion for modification of child support. He sought a reduction in his monthly child support payment on the ground that Hilary's financial circumstances had changed as a result of receiving substantial cash proceeds from her sale of the Monte Sereno house. Hilary opposed the motion and sought an increase in child support, based on her contention that the amount of child support to which she had previously agreed was less than the statewide uniform guideline amount[6] because Thomas's investment income had not been included. Hilary also argued that the children were entitled to share in Thomas's extraordinarily high standard of living, which she could not provide under the current child support order and her own resources.

In support of her opposition, Hilary submitted the declaration of her accounting expert, Charles Helfrick. Helfrick prepared a schedule of assets, debts and net worth for each party, concluding that Hilary had a net worth of $4,243,911 and Thomas had a net worth of $19,645,021. Thomas's assets included net equity of $6,659,729 in his brokerage account, equity of $6.45 million in his Pebble Beach residence, and equity of $1,125,000 in his Hillsborough real property.

---

[5] The DissoMaster is a privately developed computer program used to calculate guideline child support under the algebraic formula required by section 4055. (*In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 524 [70 Cal.Rptr.2d 488].)

[6] "[T]he uniform guideline statutes require that, in determining the appropriate amount of child support (whether pendente lite, permanent, or on a request for modification of an existing order), all California courts must adhere to the guideline formula. (§ 4052 [the trial court 'shall adhere to the statewide uniform guideline and may depart from the guideline only in the special circumstances set forth in this article']; [citation].)" (*In re Marriage of Laudeman* (2001) 92 Cal.App.4th 1009, 1013 [112 Cal.Rptr.2d 378].) The formula for calculating guideline child support is set forth in section 4055.

Helfrick also calculated Thomas's monthly income for purposes of child support using three different measures, including (1) actual interest income of $803 per month plus long-term capital gains income of $252,137 per month; (2) monthly withdrawals from Thomas's brokerage account of $108,027; and (3) attribution of a 3 percent rate of return on the net worth of his various investments, which resulted in a monthly income of $31,057. Helfrick also performed similar calculations to determine Hilary's monthly income, with the exception that he did not calculate her income based on monthly brokerage account withdrawals because, unlike Thomas, she did not withdraw from her account on a regular basis to pay her expenses.

Helfrick then used the DissoMaster program to calculate Thomas's monthly child support obligation. When the parties' income was calculated on the basis of actual interest income plus capital gains, the DissoMaster calculation indicated that Thomas owed monthly child support of $38,383. In comparison, when income was attributed to both parties based on a 3 percent rate of return on their investments, the DissoMaster calculation indicated that Thomas owed monthly child support of $6,772.

In reply, Thomas asserted that the declaration of his accounting expert, Richard Wilkolaski, showed that Helfrick's calculations did not follow accounting practices and should be disregarded as nonsensical.[7] Thomas further argued that Hilary had failed to maximize her income when she loaned a friend $800,000 at an interest rate of 4.25 percent and did not increase the rent on her Philadelphia rental property.

### C. *The Evidentiary Hearing on the Motion*

An evidentiary hearing on the motion for modification of child support was held on August 31, 2004.[8] The witnesses included the parties and their accounting experts. A brief summary of their testimony follows.

#### *Thomas Williams*

Thomas testified that his assets include two parcels of real estate and a brokerage account with a July 2004 net value of $5.3 million. The brokerage account is managed for growth rather than income. In the past year, Thomas withdrew money from the brokerage account to pay his living expenses and other expenses such as legal fees. His monthly expenses are a little more than $54,863.

---

[7] The declaration of Richard Wilkolaski was not included in the record on appeal.

[8] Pursuant to the parties' stipulation, the matter was heard by Richard C. Berra, Temporary Judge (see Cal. Const., art. VI, § 21).

In December 2003, Thomas purchased a house in Hillsborough with a partner. He invested $1,295,872 in the property and pays the monthly mortgage of $12,000. He does not live in or rent the Hillsborough house and considers it an investment property. Thomas also owns a home in Pebble Beach that has been appraised at $10 million or $11 million. The mortgage on the Pebble Beach house is $4.55 million, and therefore he has equity of between $5.45 million and $6.45 million in that property.

Thomas believes that Hilary received approximately $5 million in cash after selling the Monte Sereno house.

*Hilary Williams*

Hilary testified that she sold the Monte Sereno house in order to buy a smaller house and free up assets to support herself and the children. The Monte Sereno house was 5,400 square feet with five bedrooms, six and one-half bathrooms, a huge kitchen, theater, wine cellar, maid's quarters, and a master suite. During the marriage, the children lived in their own wing in the Monte Sereno house and also spent weekends in the Pebble Beach mansion. Hilary described the Pebble Beach property as "a large palatial estate" set on nearly three acres on the Seventeen Mile Drive. She and Thomas remodeled the mansion to its current size of 11,000 square feet. The children had extremely large bedrooms there.

After selling the Monte Sereno house, Hilary purchased a 2,325-square-foot house in Los Gatos set on one hillside acre, with three bedrooms and two and one-half bathrooms. The children share "cramped quarters" that include "tiny" bedrooms and a bath. Hilary paid $1.45 million for the Los Gatos house and set aside funds for a $1,265,000 remodel that would improve their standard of living by, among other things, adding larger bedrooms and a bath for each child. Hilary believes that the children have taken a "huge hit" in their standard of living as a result of the divorce.

Hilary is not employed and agreed that monthly employment income of $2,800 would be attributed to her. She acknowledged that she had loaned $800,000 to a friend at a 4.25 percent interest rate. She had also purchased real property in Philadelphia as an investment. That property cost $125,000 and is rented for $1,200 per month.

Hilary's monthly expenses total $15,000 per month, excluding her tax liability. At the time of the hearing, she owed nearly $700,000 in capital gains tax.

### Charles Helfrick

Charles Helfrick is a certified public account who was retained to assist Hilary with regard to the motion to modify child support. He reviewed the financial documents of Thomas and Hilary and amended the child support schedules that he originally prepared in connection with his declarations. Helfrick amended his figure for Hilary's assets by adding $125,000 to account for the value of the Philadelphia property and the rental income, as well as a $1,300 bank account that he had overlooked. He also reduced the projected capital gains taxes from the sale of the Monte Sereno house. Helfrick further determined that Thomas's current net worth is $14,645,000.

Helfrick presented three possible methods for calculating child support, set forth in schedule A, schedule B, and schedule C. In schedule A, Helfrick stated that the total net value of Thomas's brokerage account was $6.6 million, based on actual earnings of $10,442 and a $3.27 million increase in stock value over the 13-month period that ended June 30, 2004. Helfrick also included an increase in the value of Hilary's assets. Applying the increase in the value of the parties' assets as the measure of their income and utilizing the DissoMaster program, Helfrick determined that Thomas's monthly child support obligation should be $39,383.

In schedule B, Helfrick measured Thomas's income on the basis of his spending, less a $1,199,635 equalizing payment to Hilary and the amounts that Thomas paid for the deposit and downpayment on the Hillsborough house. According to Helfrick, Thomas withdrew $3,723,282 from his brokerage account during the 13-month period that ended June 30, 2004, for average spending of $108,000 per month. Helfrick applied Thomas's spending as a measure of his income in a second DissoMaster calculation, but did not state in his testimony the child support amount derived by that method.

In schedule C, Helfrick measured Thomas's income by attributing a return rate of 3 percent to Thomas's investments in the amount of $12,422,000. He chose the 3 percent rate because that is a reasonable rate of return over the longer term. The figure of $12,422,000 was chosen because Helfrick believes that Thomas could obtain a return on that portion of his wealth, which includes the equity in his brokerage account and other bank accounts as well

as the equity in the Pebble Beach house and the Hillsborough house. Helfrick subtracted $1.8 million in Pebble Beach home equity in calculating Thomas's income based on investment returns, because in his view that is a reasonable amount of home equity to be shielded from child support.[9] Helfrick also allowed Hilary to shield $1.8 million in home equity.

Helfrick acknowledged that he had never attributed income to home equity before, but explained that this case was different due to "the magnitude of equity being sheltered in the personal residence. [¶] . . . [¶] This is a case of almost $6,000,000 of equity tied up into the Pebble Beach house . . . ."

### Richard Wilkolaski

Richard Wilkolaski is a certified public account who was retained by Thomas to calculate child support and to comment on the declaration filed by Hilary's accounting expert, Charles Helfrick. To calculate child support using the DissoMaster program, Wilkolaski adopted the amount that Helfrick had determined was Thomas's actual income from his brokerage account, which is $803 per month. Wilkolaski also adopted Helfrick's figures for Hilary's income, with the addition of $1,200 per month in rental income. He also agreed with Helfrick's determination that Thomas's net worth is approximately $14.8 million. However, Wilkolaski disagreed that the $1,265,000 that Hilary had set aside to remodel the Los Gatos house and her capital gains tax liability of $628,735 should be considered liabilities, since those funds were still in the bank.

Regarding Thomas's spending, Wilkolaski reviewed Thomas's investment account statements and determined that Thomas spent a net average of $28,450 per month after margin interest was subtracted. Wilkolaski explained that Thomas uses a margin line of credit on his brokerage account to pay his expenses. However, Wilkolaski did not include Thomas's mortgage payments in his monthly expenses because he considers mortgage payments to be investments.

Wilkolaski disputed Helfrick's opinion that income should be imputed to Thomas based on attribution of a return on his investments. In particular, Wilkolaski disagreed that a 3 percent rate of return should be attributed to the equity in the Pebble Beach residence, because "[h]ow he's going to earn three percent on his residence, I don't know."

---

[9] At oral argument, the parties indicated that the figure of $1.8 million was based on the equity in Hilary's Los Gatos home.

### D. The Trial Court's Ruling

Before the trial court issued its tentative decision, the parties submitted written closing arguments. The trial court issued its tentative decision on November 4, 2004.

#### 1. The Tentative Decision

The trial court made a number of factual findings with regard to child support. Hilary's net worth was found to be approximately $5.4 million, or approximately $4.2 million if the cost of remodeling the Los Gatos home was treated as a liability. The court also noted Hilary's stipulation that employment income of $2,800 per month would be attributed to her. As to Thomas, the trial court found that his net worth was not less than $15 million and could be as high as $19 million. Additionally, the court noted Thomas's stipulation that employment income of $20,833 per month would be attributed to him.

In determining the appropriate method for calculating the amount of child support payable by Thomas, the trial court rejected the recommendation of Wilkolaski, Thomas's accounting expert, that child support should be calculated on the basis of Thomas's actual monthly income of $803 and Hilary's actual monthly income of $6,433. The trial court also observed that Wilkolaski had not provided any methodology for determining the appropriate amount of child support based on the parties' assets. The trial court further determined that two of the three methods suggested by Helfrick, Hilary's accounting expert, were not appropriate, including "[l]ooking at the growth of each party's brokerage accounts" and "[l]ooking at each party's spending."

The trial court ultimately selected the third method suggested by Helfrick, which the court described as "[a]ttributing a reasonable rate of return to each party's respective net worth in excess of a reasonable amount to be used for a residence by each party." In choosing this method, the trial court relied on the decisions in *In re Marriage of Destein* (2001) 91 Cal.App.4th 1385 [111 Cal.Rptr.2d 487] and *In re Marriage of Dacumos* (1999) 76 Cal.App.4th 150 [90 Cal.Rptr.2d 159]. The trial court also found it significant that Thomas had "positioned his investments in such a way that his significant net worth is being substantially under-utilized."

Based on the accounting experts' testimony, the trial court found that after allocating $1.8 million for a residence (in accordance with Helfrick's opinion), Thomas had between $14.6 million and $14.8 million available for investment return. The trial court then applied a 3 percent rate of return,

which the court found to be "conservative and appropriate," and resulted in a monthly income of $31,057. As to Hilary, the trial court found that her net worth available for investment was $3.8 million, which at a 3 percent rate of return yielded a monthly income of $9,576 per month (the court noted this was greater than her actual monthly income of $6,435).

Using these imputed income figures, the trial court then calculated the amount of statewide uniform guideline child support using the DissoMaster program. The trial court's DissoMaster calculation indicated that guideline child support is $7,177 per month, which the trial court ordered Thomas to pay beginning April 1, 2004. The trial court additionally stated that the court's previous order requiring Thomas to pay 75 percent of "add-ons," including private school tuition for Kirstie, the children's uninsured medical, dental and therapeutic expenses, and agreed-upon extracurricular expenses, would remain in effect.

### 2. *Objections to the Tentative Decision*

Both parties filed objections to the tentative decision. Only Thomas's objections were included in the record on appeal. The trial court filed an order regarding the objections to the tentative decision, in which the trial court denied most of Thomas's objections as constituting reargument of the case. The trial court also noted that Thomas had not cited any case law for the proposition that the court was barred from "attributing income to home value in excess of a reasonable value for a home as it did in this case."

### 3. *Findings and Order After Hearing*

On February 1, 2005, the trial court entered its findings and order after hearing. The order requires Thomas to pay monthly child support of $7,177 commencing April 1, 2004, as indicated in the tentative decision.

## III. DISCUSSION

On appeal, Thomas challenges the order of February 1, 2005, which modifies the previously stipulated child support order by increasing his monthly child support payment from $3,411 to $7,177.

### A. *The Standard of Review*

The standard of review for an order modifying a child support order is well established. "[A] determination regarding a request for modification of a child support order will be affirmed unless the trial court abused its discretion, and it will be reversed only if prejudicial error is found from examining the

record below." (*In re Marriage of Leonard* (2004) 119 Cal.App.4th 546, 555 [14 Cal.Rptr.3d 482] (*Leonard*); see *In re Marriage of Pearlstein* (2006) 137 Cal.App.4th 1361, 1371 [40 Cal.Rptr.3d 910].) Thus, "[t]he ultimate determination of whether the individual facts of the case warrant modification of support is within the discretion of the trial court. [Citation.] The reviewing court will resolve any conflicts in the evidence in favor of the trial court's determination. [Citation.]" (*Leonard, supra,* 119 Cal.App.4th at p. 556.)

However, as this court has previously observed, "the trial court has 'a duty to exercise an informed and considered discretion with respect to the [parent's child] support obligation . . . .' [Citation.] Furthermore, 'in reviewing child support orders we must also recognize that determination of a child support obligation is a highly regulated area of the law, and the only discretion a trial court possesses is the discretion provided by statute or rule. [Citations.]' [Citation.] In short, the trial court's discretion is not so broad that it 'may ignore or contravene the purposes of the law regarding . . . child support. [Citations.]' [Citation.]" (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 282–283 [111 Cal.Rptr.2d 755] (*Cheriton*).)

### B. *Modification of a Stipulated Child Support Order*

 With certain exceptions not applicable here, the trial court may modify or terminate a child support order at any time the court deems it necessary. (*Leonard, supra,* 119 Cal.App.4th at p. 556; § 3651, subd. (a).)[10] The statutory procedures for modification of a child support order "require a party to introduce admissible evidence of changed circumstances as a necessary predicate for modification." (*Cheriton, supra,* 92 Cal.App.4th at p. 298; §§ 3650–3693.) "The burden of proof to establish that changed circumstances warrant a downward adjustment in child support rests with the supporting spouse." (*Leonard, supra,* 119 Cal.App.4th at p. 556.)

 Where the parties have stipulated to a child support order that is below the amount established by the statewide uniform guideline, the order may be modified to guideline level or above without a showing of changed circumstances. (§ 4065, subd. (d); *In re Marriage of Laudeman, supra,* 92 Cal.App.4th at p. 1015.) However, when the parents stipulate to below-guideline child support, they must declare "that they are fully informed of their rights concerning child support, that they agreed to the order without coercion or duress, that the agreement is in the best interests of the children, that the needs of the children will be adequately met by the stipulated

---

[10] Section 3651, subdivision (a), provides, "Except as provided in subdivisions (c) and (d) and subject to Article 3 (commencing with Section 3680) and Sections 3552, 3587, and 4004, a support order may be modified or terminated at any time as the court determines to be necessary."

amount, and that the right to support has not been assigned to the county. (§ 4065, subd. (a), . . . [citation].)" (92 Cal.App.4th at pp. 1013–1014.)

Additionally, an order for child support that is below or above the guideline amount "triggers the court's sua sponte obligation to state, in writing or on the record, (1) the amount of support that would have been ordered under the guideline formula; (2) the reasons the ordered amount of support differs from the guideline formula amount; and (3) the reasons the ordered amount of support is consistent with the best interests of the children. (§ 4065, subd. (a); cf. § 4056, subd. (b) [additional findings required only when requested by a party]; [citation].)" (*In re Marriage of Laudeman, supra,* 92 Cal.App.4th at p. 1014.)

In the present case, Thomas moved for modification of the previously stipulated child support order. He sought a reduction of his $3,411 monthly child support payment on the ground that Hilary's changed circumstances, consisting of her receiving approximately $5 million from the sale of the Monte Sereno house, warranted a downward adjustment. The trial court rejected Thomas's request and instead increased the amount of child support to $7,177, based on Hilary's contention that an increase was necessary in light of Thomas's multimillion-dollar investments and the discrepancy in the parties' standard of living.

On appeal, Thomas contends that the trial court erred in modifying the child support order because Hilary failed to show the requisite change of circumstances in his financial condition. In its tentative decision, the trial court stated that no showing of changed circumstances was required because no findings had been made as to whether the stipulated child support order was at, below, or above guideline. Alternatively, the trial court found that material changed circumstances existed as to each party's financial condition, including Hilary's sale of the Monte Sereno house and investment of a significant portion of the sale proceeds, and Thomas's purchase of a $5 million investment property in Hillsborough.

Our review of the record on appeal reveals that the parties did not make the declaration that must accompany a stipulated below-guideline child support order, nor did the trial court make the findings required for a child support order that is above or below guideline. (§ 4065, subd. (a).) Therefore, assuming that the stipulated child support order of $3,411 per month was at the guideline amount, a showing of changed circumstances was a necessary predicate to an upward modification of the child support order. (*Cheriton, supra,* 92 Cal.App.4th at p. 298; §§ 3650–3693.)

·We find that the trial court did not abuse its discretion when the court found the requisite change in circumstances, because the changes in the parties' respective financial conditions were essentially undisputed. Hilary had received proceeds of $5 million from the sale of the Monte Sereno house, while Thomas had invested over $1 million in the purchase of a house in Hillsborough and become liable for the $12,000 per month mortgage payments. The necessary predicate for modification was therefore satisfied. (See *Cheriton, supra,* 92 Cal.App.4th at p. 298.)

### C. *Consideration of Investment Assets in Calculating Child Support*

Thomas argues that the trial court erred in determining that his income for purposes of calculating child support should include attribution of an assumed 3 percent rate of return on his investment assets, including the net worth of his brokerage account and the equity in the Hillsborough property, because Hilary failed to show that imputation of income to his investment assets was necessary to meet the needs of the children. He asserts that his "actual investment income ($803/month) was the presumptively correct figure to use for the guideline support calculation (along with his stipulated imputed employment income of $250,000/year), and Hilary bore the burden of proving whether a higher award was justified."

Hilary counters that it is well established that the trial court has the discretion to impute income to assets when determining child support. She also asserts that the trial court's decision to impute income based on a modest rate of return on Thomas's assets did not constitute an abuse of discretion in light of the disparity in the parties' housing situations and monthly living expenses.

· To evaluate the merits of Thomas's claim of trial court error, we first review California law governing the trial court's determination of the parents' income for the purpose of calculating guideline child support.

### 1. *Determination of Parental Income*

██ This court has previously outlined the statutes and public policy governing the calculation of child support awards and the related determination of parental income. "California has a strong public policy in favor of adequate child support. [Citations.] That policy is expressed in statutes embodying the statewide uniform child support guideline. (See [§§] 4050–4076.) 'The guideline seeks to place the interests of children as the state's top priority.' (§ 4053, subd. (e).) In setting guideline support, the courts are required to adhere to certain principles, including these: 'A parent's first and principal obligation is to support his or her minor children according

to the parent's circumstances and station in life.' (§ 4053, subd. (a).) 'Each parent should pay for the support of the children according to his or her ability.' (§ 4053, subd. (d).) 'Children should share in the standard of living of both parents. Child support may therefore appropriately improve the standard of living of the custodial household to improve the lives of the children.' (§ 4053, subd. (f).)" (*Cheriton, supra,* 92 Cal.App.4th at p. 283, fn. omitted.)

To implement these policies, courts are required to calculate child support under the statutory guidelines. (See §§ 4052–4055.) "[A]dherence to the guidelines is mandatory, and the trial court may not depart from them except in the special circumstances enumerated in the statutes. (§§ 4052, 4053, subd. (k); [citation].)" (*Cheriton, supra,* 92 Cal.App.4th at p. 284.) The guideline amount of child support, which is calculated by applying a mathematical formula to the parents' incomes, is presumptively correct. (*In re Marriage of de Guigne* (2002) 97 Cal.App.4th 1353, 1359 [119 Cal.Rptr.2d 430] (*de Guigne*); § 4057.)[11]

■ Parental income is "broadly defined" for the purpose of calculating child support under the statutory guidelines. (*Cheriton, supra,* 92 Cal.App. 4th at p. 285.) Thus, "[s]ubject to certain statutory exceptions, which do not apply here, gross income 'means income from whatever source derived . . . .' (§ 4058, subd. (a).) Although it specifically lists more than a dozen possible income sources, by the statute's express terms, that list is not exhaustive. [Citations.] Rather, the codified income items 'are *by way of illustration* only. Income from other sources . . . should properly be factored into the "annual gross income" computation. [Citations.]' [Citation.]" (*Cheriton, supra,* 92 Cal.App.4th at p. 285.)

### 2. *Attributing Income to Assets*

■ Regarding a parent's assets, the California Supreme Court has stated, "Assets at the time of dissolution play little part in the computation of child support. They may enter indirectly into the calculation in two ways: (1) In assessing earning capacity, a trial court may take into account the earnings from invested assets (see, e.g., [*Cheriton, supra,*] 92 Cal.App.4th [at p. 292]);

---

[11] Section 4057 provides in pertinent part, "(a) The amount of child support established by the formula provided in subdivision (a) of Section 4055 is presumed to be the correct amount of child support to be ordered. [¶] (b) The presumption of subdivision (a) is a rebuttable presumption affecting the burden of proof and may be rebutted by admissible evidence showing that application of the formula would be unjust or inappropriate in the particular case, consistent with the principles set forth in Section 4053, because one or more of the following factors is found to be applicable by a preponderance of the evidence, and the court states in writing or on the record the information required in subdivision (a) of Section 4056 . . . ."

and (2) a court may deem assets a 'special circumstance' ([§] 4057, subd. (b)(5)) that may justify a departure from the guideline figure for support payments [citation]. But these are exceptional situations; the child support obligation is based primarily on actual earnings and earning capacity." (*Mejia v. Reed* (2003) 31 Cal.4th 657, 671 [3 Cal.Rptr.3d 390, 74 P.3d 166].)

In *Cheriton*, we determined that the trial court had erred in failing to include the father's gross proceeds of $9.75 million from his exercise of stock options and sale of stock in determining the father's income. (*Cheriton, supra,* 92 Cal.App.4th at p. 289.) By refusing to consider the father's substantial wealth in setting child support, the trial court had effectively permitted him to avoid his obligation to support his children according to his " 'ability,' " his " 'circumstances and station in life,' " and his " 'standard of living.' (§ 4053, subds. (d), (a), (f).)" (*Cheriton, supra,* 92 Cal.App.4th at p. 292, fn. omitted.)

We concluded in *Cheriton* that "the trial court's refusal to consider [the father's] substantial wealth in setting child support may have resulted in an order that is too low to be in the best interests of his children, based on an assessment of their reasonable needs. (See § 4053, subd. (e).)" (*Cheriton, supra,* 92 Cal.App.4th at p. 292.) We remanded the matter for the purpose of, among other things, allowing the trial court to "[a]t the very least, . . . consider imputing reasonable income on [the father's] assets, pursuant to section 4058, subdivision (b), to the extent necessary to meet the children's reasonable needs. [Citation.]" (*Ibid.*)

Our analysis in *Cheriton* acknowledged the decisions in *In re Marriage of Destein, supra,* 91 Cal.App.4th 1385 (*Destein*) and *In re Marriage of Dacumos, supra,* 76 Cal.App.4th 150 (*Dacumos*), which the trial court relied upon in the present case. The decisions in *Destein* and *Dacumos* are instructive with respect to the attribution of income to a supporting parent's underutilized or non-income-producing assets.

 In *Destein*, the issue was whether the trial court had abused its discretion in imputing to the father "a hypothetical rate of return on his real estate investments when those investments do not produce income and would need to be liquidated to do so." (*Destein, supra,* 91 Cal.App.4th at pp. 1390–1391.) The court in *Destein* found no error, first recognizing that "[t]he only statutory limitation on the court's discretion to apply the earning capacity doctrine to investment assets is the best interests of the child." (*Id.* at p. 1394; see § 4058, subd. (b).)[12]

---

[12] Under section 4058, subdivision (b), "[t]he court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children."

The appellate court in *Destein* also determined that there was no legal bar to the attribution of income to assets that were allocated for growth rather than income. (*Destein, supra,* 91 Cal.App.4th at p. 1395.) Additionally, the trial court could address the difference in the parties' living standards by imputing income from the father's real estate investments. (*Id.* at p. 1397.) Finally, the court in *Destein* found that attribution of a 6 percent rate of return on the equity in the father's assets, pursuant to the opinion of the mother's accounting expert, was reasonable. (*Id.* at pp. 1397–1398.)

In *Dacumos,* the appellate court similarly considered the issue of whether income could be attributed to a father's non-income-producing assets. (*Dacumos, supra,* 76 Cal.App.4th at pp. 153–154.) The father had two rental properties, which he rented at a loss. (*Id.* at p. 153.) The court in *Dacumos* ruled that the trial court did not err in imputing income to the rental properties, noting that "[t]his broader definition of earning capacity to include income that could be derived from income-producing assets as well as from work is in accord with . . . legislative intent." (*Id.* at pp. 154–155.) Further, the court reasoned that "[j]ust as a parent cannot shirk his parental obligations by reducing his earning capacity through unemployment or underemployment, he cannot shirk the obligation to support his child by underutilizing income-producing assets." (*Id.* at p. 155.)

Thus, it is now well established that "where the supporting party has chosen to invest his or her funds in non-income-producing assets, the trial court has discretion to impute income to those assets based on an assumed reasonable rate of return. [Citations.]" (*In re Marriage of Pearlstein, supra,* 137 Cal.App.4th at pp. 1373–1374, fn. omitted.) The *Pearlstein* court accordingly ruled that the trial court had the discretion to impute a reasonable rate of return on the value of stock that the father had received in connection with the sale of a business, to the extent the stock was available for sale, and to add that amount to the father's gross income. (*Id.* at p. 1376; see also *In re Marriage of Schlafly* (2007) 149 Cal.App.4th 747, 755–756 [57 Cal.Rptr.3d 274] [court may impute 3 percent rate of return on stock market portfolio]; *County of Kern v. Castle* (1999) 75 Cal.App.4th 1442, 1453–1454 [89 Cal.Rptr.2d 874] [court may impute income based on interest that could be earned from investment of lump sum inheritance].)

The above authorities thus establish that under the earning capacity doctrine (§ 4058, subd. (b)) the trial court has the discretion to impute a reasonable rate of return on the supporting parent's underutilized or non-income-producing investment assets in order to calculate guideline child support in the best interests of the child. Keeping this principle in mind, we turn to our analysis of the trial court's child support order in the present case.

### 3. *Analysis*

Thomas contends that the trial court erred in increasing his child support obligation to $7,177 per month after determining that his income should include, among other things, attribution of an assumed 3 percent rate of return on his investment assets, consisting of the net worth of his brokerage account and the equity in his Hillsborough house. Thomas's chief complaint is that Hilary failed to show that attribution of income to his investment assets was necessary to meet the needs of the children. He does not challenge the selection of 3 percent as a reasonable rate of return.

■ Thomas relies on our decision in *Cheriton* for the proposition that a trial court may impute income to investment assets only to the extent necessary to meet the children's reasonable needs, which must be proven by the nonsupporting parent. However, our focus in *Cheriton* was on the best interests of the children, and whether "the trial court's refusal to consider [the father's] substantial wealth in setting child support may have resulted in an order that is too low to be in the best interests of his children, based on an assessment of their reasonable needs. (See § 4053, subd. (e).)" (*Cheriton, supra,* 92 Cal.App.4th at p. 292.) We noted that "in the case of wealthy parents . . . the well-established principle [is] that the 'child's need is measured by the parents' current station in life.' [Citations.]" (*Cheriton, supra,* 92 Cal.App.4th at p. 293.) Thus, " '[c]learly where the child has a wealthy parent, that child is entitled to, and therefore 'needs' something more than the bare necessities of life.' [Citation.]" (*Ibid.*)

Our ruling in *Cheriton* was therefore consistent with "the state's top priority," which is the best interests of the children. (*Dacumos, supra,* 76 Cal.App.4th at p. 155.) To ensure that child support orders are made in the best interests of the children, section 4053, which provides for implementation of the statewide uniform guidelines for child support, "gives a court great latitude in applying its principles to individual cases. In outlining relevant considerations, the Legislature did not limit the guidelines simply to parental income from salary, return on investment, or from any other particular source. Rather, it adopted the broader concepts of station in life, ability to pay, and standards of living." (*de Guigne, supra,* 97 Cal.App.4th at p. 1366.) Consequently, "our Supreme Court has refused to read any limitation into a trial court's discretion to impute income when in the child's best interests." (*Destein, supra,* 91 Cal.App.4th at p. 1396; see *Moss v. Superior Court* (1998) 17 Cal.4th 396, 424 [71 Cal.Rptr.2d 215, 950 P.2d 59].)

Here, the trial court implicitly determined that the children's best interests would be served by an increase in guideline child support, calculated in part by attributing an assumed 3 percent rate of return on Thomas's investment assets. On appeal, it is Thomas's burden to show that the trial court abused its discretion in so ruling. We find that Thomas has not met this burden. As we have discussed, the trial court has the discretion, where it is in the children's best interests, to impute income to underutilized or non-income-producing investment assets. Thomas has not attempted to show that the increase in guideline child support resulting from the trial court's imputation of income to his investment assets does not serve the children's best interests.

For these reasons, we believe that the trial court did not err in attributing a 3 percent rate of return on Thomas's investment assets, including his stock portfolio and the investment in the Hillsborough house, in its determination of his income for the purpose of calculating guideline child support.

### D. *Consideration of Home Equity in Calculating Child Support*

Thomas also contends that the trial court erred in increasing his child support obligation because the court attributed income to the equity in his Pebble Beach residence. He asserts that income cannot be attributed to home equity absent a showing of special circumstances under section 4057, subdivision (b). Hilary maintains that the trial court properly attributed a reasonable rate of return on home equity under the circumstances of this case, where Thomas has invested a large portion of his wealth in his residence. For the reasons discussed below, we agree with Thomas.

#### 1. *Attributing Income to Home Equity*

The decisions discussed in part C., above, authorized the imputation of income to a parent's investment assets, and did not expressly address the issue of whether income may be imputed to home equity. That issue was considered in the context of an increase in home equity in *In re Marriage of Henry* (2004) 126 Cal.App.4th 111 [23 Cal.Rptr.3d 707] (*Henry*).

In *Henry*, the trial court found that an increase in the value of mother's home constituted income. (*Henry, supra*, 126 Cal.App.4th at pp. 117–118.) The appellate court disagreed, noting there was no authority for the proposition that "the increase in the equity value of a parent's residence constitutes income or earning capacity for purposes of calculating child support under section 4058." (*Id.* at p. 118.) Further, the court in *Henry*

determined that the broad definition of income set forth in section 4058 was not limitless and did not "reach so far as to include the increase in equity of a parent's residence, forcing the parent to sell or refinance the home in order to make court-ordered support payments." (126 Cal.App.4th at p. 119.)

Hilary has not cited any decision in which the appellate court established a bright-line rule that home equity may be considered in determining a parent's income for the purpose of calculating guideline child support, and we decline to do so in the present case. However, we find the decision in *de Guigne, supra*, 97 Cal.App.4th 1353, to be particularly instructive with regard to the proper consideration of the wealth invested in a supporting parent's residence in determining child support.

In *de Guigne*, the wealthy father had inherited a Hillsborough estate worth over $20 million and had an annual trust and securities income of $240,000. (*de Guigne, supra*, 97 Cal.App.4th at p. 1358.) During the marriage, the parents and their two children lived in a mansion on the Hillsborough estate and maintained "an opulent lifestyle," with "two housekeepers, three gardeners, a laundress, chef, child care provider and a part-time chauffeur." (*Id.* at p. 1357.) The father requested a child support order of $4,844 per month, based on applying the statutory guidelines to his annual trust and securities income of $240,000. The trial court ordered him to pay child support of $15,000 per month, as well as the children's private school tuition and tutoring expenses. (*Id.* at pp. 1358–1359.)

The appellate court in *de Guigne* affirmed the award of child support, although it was approximately three times greater than the amount provided by the statutory guidelines. (*de Guigne, supra*, 97 Cal.App.4th at p. 1360.) The upward departure was deemed to be consistent with both section 4053, which "provides that parents should support their children at a level commensurate with their ability," and section 4057, which provides that a deviation from guideline support is authorized where there are "special circumstances in which the formula amount would be inappropriate." (97 Cal.App.4th at p. 1361.) The special circumstances in *de Guigne* included the "imbalances" in the type of housing and the lifestyle available to the children and the father if guideline child support of $4,844 per month was ordered. (*Id.* at p. 1364.)

The *de Guigne* court concluded that the trial court had properly considered these special circumstances in "attempting to mitigate an overall decline in the children's standard of living. The $15,000 child support awarded was

rationally related to the children's predissolution standard of living and expenses, and to [the father's] ability to pay." (*de Guigne, supra*, 97 Cal.App.4th at p. 1365.) The appellate court also found that the Hillsborough estate, where the father continued to live after the marriage, was "not a typical residence. It rests on substantial acreage situated in one of the most exclusive and desirable locations in the Bay Area. . . . [S]elling 40 acres of the property and investing the proceeds could yield sufficient income to shield the children from the full financial impact of the divorce, yet allow [the father] to retain his ancestral home on seven and one-half acres of land." (*Id.* at p. 1364.)

Thus, in *de Guigne*, the appellate court determined that an award of guideline child support calculated on the basis of the supporting parent's investment income alone, without consideration of the wealth invested in his $20 million residence, was inconsistent with the children's best interests due to special circumstances consisting of the disparity between the housing and lifestyle available to the supporting parent and his children under guideline child support. However, the court in *de Guigne* also noted that the trial court could not arbitrarily impose above-guideline child support, and was required under section 4056, subdivision (a), to specify, either in writing or on the record, "the reasons for a deviation and how the deviation is consistent with the children's best interest." (*de Guigne, supra*, 97 Cal.App.4th at p. 1364.)

### 2. *Analysis*

In the present case, Thomas argues that the trial court was precluded from imputing income based on an assumed 3 percent return on the home equity in his Pebble Beach estate. Relying on the decision in *Henry, supra*, 126 Cal.App.4th 111, Thomas asserts that as a matter of law income cannot be imputed to home equity absent a showing under section 4057, subdivision (b)[13] of special circumstances rendering a guideline child support award unjust or inappropriate.

Thomas also asserts that public policy reasons preclude the imputation of income to a parent's home equity, asserting that "[v]irtually every home will turn into a potential source of conflict, and simply residing in an affluent community like Pebble Beach or Saratoga will practically guarantee litigation over how much 'income' to impute to substantial residence values."

---

[13] Section 4057, subdivision (b) provides, "The presumption of subdivision (a) is a rebuttable presumption affecting the burden of proof and may be rebutted by admissible evidence showing that application of the formula would be unjust or inappropriate in the particular case, consistent with the principles set forth in Section 4053, because one or more of the following factors is found to be applicable by a preponderance of the evidence, and the court states in writing or on the record the information required in subdivision (a) of Section 4056 . . . ."

Hilary responds that *Henry* is distinguishable because the trial court in that case did not apply an investment rate of return to the home equity, and also because there was no indication that the mother's home equity was part of an overall investment portfolio that "vastly minimized her income." Additionally, Hilary contends that the trial court properly imputed income to Thomas's home equity in order to calculate guideline child support because Thomas "purposefully holds much of his wealth in his two residences," keeping "his income to a minimum, yet liv[ing] lavishly based on margin loans and the enjoyment of his appreciating, non-income-producing real estate."

In this case, we must determine whether the trial court abused its discretion in determining that Thomas's income includes attribution of a 3 percent return on the home equity in Thomas's Pebble Beach residence in excess of $1.8 million. Having reviewed the record and the applicable authorities, we determine that the trial court erred. Primarily, we find no precedent that expressly allows attribution of an assumed rate of return on the supporting parent's home equity in determining the parent's income for the purpose of calculating guideline child support, even if a certain amount of home equity is sheltered.

■ Moreover, as we have discussed, the trial court may properly attribute income based on an assumed reasonable rate of return on underutilized or non-income-producing investment assets. (*In re Marriage of Pearlstein, supra,* 137 Cal.App.4th at pp. 1373–1374; *Destein, supra,* 91 Cal.App.4th at p. 1395.) However, a supporting parent's home equity generally may not be considered for the purpose of calculating child support absent a showing of special circumstances under section 4057, subdivision (b), that render guideline support unjust or inappropriate. (See *de Guigne, supra,* 97 Cal.App.4th 1353.)

■ In the present case, Hilary did not make a showing under section 4057, subdivision (b), of special circumstances rendering guideline support unjust or inappropriate. The trial court therefore erred in including a hypothetical 3 percent return on Thomas's home equity in determining Thomas's income for purposes of calculating guideline child support. Accordingly, we conclude that the trial court abused its discretion in ordering Thomas to pay monthly guideline child support of $7,177, and we will reverse that portion of the judgment. We will remand the matter for reconsideration of the child support order in light of the view expressed in this opinion that Thomas's home equity may not be considered for the purpose of calculating child support absent a showing of special circumstances under section 4057, subdivision (b), that render guideline support unjust or inappropriate.

Our ruling is without prejudice to Hilary seeking an upward departure from guideline child support under section 4057, subdivision (b). We also express no opinion regarding the correct amount of child support. However, in the event the trial court determines that a deviation from guideline child support is justified, the trial court is directed to comply with the requirements of section 4056.[14]

Having decided the issue on the merits, we do not reach Hilary's alternative contentions that Thomas either waived any claim of error or invited error with respect to the trial court's determination of his income because he initiated the trial court's consideration of the parties' assets when he filed his motion for modification of the child support order.

### E. *Calculation Errors*

Thomas's final contention on appeal is that the trial court made three "calculation" errors in determining child support. First, Thomas asserts that the trial court failed to impute any return on either Hilary's home equity of $580,000 or the fund of $1,265,000 that she set aside for remodeling the Los Gatos house. Second, Thomas complains that the trial court assumed a 3 percent return on Hilary's investment assets although her net rental return on her Philadelphia investment property was "double that rate" and she had loaned $800,000 at 4.25 percent interest. Third, the trial court erred in failing to impute any return on the fund of $576,000 that Hilary had reserved for payment of capital gains taxes. According to Thomas, these calculation errors resulted in "a far higher guideline support award than if the court had simply charged each party with an investment return on the actual amount of their home equity."

Because we have determined that the portion of the judgment awarding child support must be reversed and the matter remanded for reconsideration, we need not address Thomas's claims of calculation error.

---

[14] Section 4056 provides, "(a) To comply with federal law, the court shall state, in writing or on the record, the following information whenever the court is ordering an amount for support that differs from the statewide uniform guideline formula amount under this article: [¶] (1) The amount of support that would have been ordered under the guideline formula. [¶] (2) The reasons the amount of support ordered differs from the guideline formula amount. [¶] (3) The reasons the amount of support ordered is consistent with the best interests of the children. [¶] (b) At the request of any party, the court shall state in writing or on the record the following information used in determining the guideline amount under this article: [¶] (1) The net monthly disposable income of each parent. [¶] (2) The actual federal income tax filing status of each parent (for example, single, married, married filing separately, or head of household and number of exemptions). [¶] (3) Deductions from gross income for each parent. [¶] (4) The approximate percentage of time pursuant to paragraph (1) of subdivision (b) of Section 4055 that each parent has primary physical responsibility for the children compared to the other parent."

## IV. DISPOSITION

The portion of the judgment ordering Thomas to pay monthly child support of $7,177 is reversed. We remand the issue of child support to the trial court for reconsideration in light of the view expressed in this opinion that Thomas's home equity may not be considered for the purpose of calculating child support absent a showing of special circumstances under section 4057, subdivision (b), that render guideline support unjust or inappropriate. Each party shall bear its own costs on appeal.

McAdams, J., and Duffy, J., concurred.

A petition for a rehearing was denied June 6, 2007, and the opinion was modified to read as printed above.