Filed 6/11/15  Marriage of Nigro CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of ELIZABETH A. and THOMAS R. NIGRO. | |
| ELIZABETH A. NIGRO,        Respondent,              v.  THOMAS R. NIGRO,        Appellant. | G049869  (Super. Ct. No. 01D003588)  O P I N I O N |

Appeal from postjudgment orders of the Superior Court of Orange County, Barry S. Michaelson, Temporary Judge (Pursuant to Cal. Const., art. VI, § 21).  Affirmed in part and reversed in part.

Law Offices of Thomas R. Nigro and Thomas R. Nigro, in pro. per; and William F. Bernard for Appellant.

Law Office of Elizabeth Nigro and Elizabeth A. Nigro, in pro. per. for Respondent.

Elizabeth and Thomas Nigro[1] divorced in 2005, but they returned to family court seven years later due to their difficulties agreeing on the best course of action for their then 15-year-old daughter Alexandra (Alex). We affirmed the family court's decision to modify the parents' joint legal custody order and temporarily modify their physical custody arrangement. (*In re Marriage of Nigro* (May 3, 2013, G046170) [nonpub. opn.] (*Nigro I*).) We also affirmed the family court's decision to sanction Elizabeth under Family Code section 271,[2] because of her sabotage of an earlier court-ordered diagnostic test to assess the appropriate treatment of Alex's Attention Deficit Hyper-Activity Disorder (ADHD) and because Elizabeth's other misconduct frustrated the policy of the law to promote settlement and resolution of issues. (*Nigro I, supra,* G046170.) We also affirmed the family court's denial of Elizabeth's motion for need-based attorney fees under section 2030. We agreed with the family court's conclusion Elizabeth elected to represent herself during the trial, and her attorney friend Merrit McKeon's performance of *additional* legal services was not reasonably necessary, and therefore, not recoverable under section 2030. (*Ibid.*)

Before we filed our opinion in *Nigro I*, Elizabeth sought need-based attorney fees and costs incurred by McKeon in preparing and handling that appeal. In our opinion *In re Marriage of Nigro* (Nov. 22, 2013, G047511) [nonpub. opn.] (*Nigro II*), we affirmed the family court's order denying Elizabeth's motion for need-based attorney fees for the appeal and future litigation.

For this appeal the parties have changed the focus of their dispute to the issue of appropriate child support for now 17-year-old Alex. Thomas filed the underlying appeal after the court increased his child support obligation by approximately $100 per

---

[1] "As is customary in family law proceedings, we refer to the parties by their first names for purposes of clarity and not out of disrespect. [Citations.]" (*Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1136, fn. 1.)

[2] All further statutory references are to the Family Code.

month and ruled he must repay Elizabeth for money spent to support the special dance program at Alex's high school. On appeal, Thomas maintains the court improperly imputed income and he cannot be forced to pay for educational costs because public education should be free.

We affirm the court's determination to impute income, but conclude one step in the court's calculations was based on an assumption not supported by the evidence. Specifically, we found no evidence in the record to support the court's determination to impute an additional seven percent net disposable income to Thomas. Therefore, we must reverse the child support modification order and remand the matter for the court to hold a hearing, consider additional evidence, hear expert opinions, or appoint a forensic accountant on the issue of whether imputing seven percent was too much, too little, or just right. We affirm the court's order that Thomas contribute to Alex's special dance program.

I

A detailed summary of the facts is contained in *Nigro I* and *Nigro II,* which we incorporate by reference. (*Nigro I, supra,* G046170; *Nigro II, supra,* G047511.) Suffice it to say, Elizabeth and Thomas, both attorneys, separated in 2002 after nearly 14 years of marriage when their only daughter, Alex, was four years old. A stipulated judgment filed in 2005 awarded the parents joint legal custody of their daughter, with primary physical custody given to Elizabeth.

Although it appears from the record that Elizabeth and Thomas continued to have disputes following the divorce, their relationship took a bad turn in 2009 after Elizabeth filed an ex parte application for an order to show cause (OSC) to eliminate Thomas's mid-week visitation. Thomas opposed the OSC and accused Elizabeth of over-medicating Alex without having a proper diagnosis. Thomas also filed an OSC requesting a full custody evaluation to determine Alex's best interests and a medical evaluation regarding Alex's need for medication. For the next two years, these issues

3

were heavily litigated, and as discussed in *Nigro I* and *Nigro II,* ultimately resulted in a change of custody order and over $8,000 in sanctions against Elizabeth.

A. *Three Child Support Modification Motions*

The child support dispute (the subject of this appeal) dates back to March 29, 2011, when Thomas filed a motion to modify his monthly $900 child support obligation, as mandated by the parties' stipulated judgment. Thomas claimed his monthly income from self-employment was a negative $5,011. He asserted Elizabeth's law practice was doing well, but he took a substantial loss in 2010. Thomas declared his net income in 2008 was $126,288, and in 2009 it was $146,718. He concluded his "average earnings over the last three years, not including my 2010 losses, [was] $91,000 per year or $7,583 per month."

Before this motion was heard, Elizabeth filed a motion on December 11, 2011, seeking Thomas's financial assistance in paying for health insurance and Alex's extra-curricular activities. Elizabeth noted the judgment provided for a $900 per month child support payment and, at the time, Elizabeth had agreed to pay for medical insurance. She maintained Alex had been a dancer for over 10 years and Thomas orally agreed to pay for half of her dance-related expenses, including tuition, costumes, and various fees charged by the dance studio, Dance Dynamics. In July 2010, Alex was accepted onto a competition team at Dance Dynamics and Elizabeth was required to sign a contract agreeing to commit to a full year of competition-related fees and training. Despite his oral promise, in September 2010, Thomas refused to reimburse Elizabeth for any dance expenses and sent her a letter stating he would no longer pay his share. Elizabeth stated she would not have contractually committed to this $6,000 expense if she had known Thomas would not pay his half.

In addition, Elizabeth explained Thomas was refusing to pay for his share of child care expenses, including after school transportation. Elizabeth stated she had

4

been paying for Alex's health insurance since 2002 but the costs had increased and she was paying $460 per month.

And finally, Elizabeth reminded the family court that Thomas agreed on April 11, 2011, to a court order that Alex would attend the charter school, Orange County High School of the Arts.[3] She admitted the court order did not state Thomas should share in the parent contribution recommended by the school to support the dance program. Elizabeth stated that while the contribution is not mandatory, given that Alex's parents earn over $250,000 per year, it would be "inappropriate and embarrassing" for them not to make the school's requested parent contribution. She added the court's expert psychologist recommended Alex should attend OCSA based on her special needs and that she should be supported in following her passion for dance. Elizabeth concluded Alex is a superior dancer and she was accepted into the very competitive commercial dance conservatory and Alex wished to pursue a career in the performing arts. Elizabeth believed dancing was Alex's "safe haven" given the level of conflict between her parents. She stated Thomas's portion of the dance program's parent annual funding agreement would total $1,424.

The record and the parties do not explain why these motions were not considered in the same year they were filed (in 2011). Our record shows that approximately two years later, on March 28, 2013, Elizabeth filed a motion to modify child support based on an increase of her time with Alex to 100 percent. In her supporting declaration, Elizabeth explained Alex had a "terrible argument" with Thomas, and Alex determined she no longer wanted to spend time with him. Elizabeth stated Thomas and his new wife purchased a mansion in Coto de Caza and a new car for Alex. However, Thomas told Alex she could only drive the car when she was at his home and

---

[3] The parties initially use the acronym OCHSA for the school, but in later briefing refer to it as the Orange County School of the Arts, or OCSA. For the sake of clarity and consistency, we will refer to the school as OCSA.

he threatened to take it away. Elizabeth declared she purchased a car for Alex to drive. Elizabeth concluded, "[Thomas was] attempting to deprive [Alex] of the lifestyle to which she is entitled by minimizing his income from his law practice, relying on his new wife's income to do so."

On May 6, 2013, Commissioner Barry S. Michaelson set a hearing on the above three child support motions. He ordered the production of several financial documents and set a discovery cut-off date. The court held a hearing, which stretched over a three-day period (2.5 hours on September 19, 3 hours on October 7, and 1.2 hours on October 15).

B. *The November 22, 2013, Tentative Decision*

The court stated Elizabeth and Thomas were licensed attorneys and appeared as self-represented litigants. The court excused the Orange County Department of Child Support Services (OCDCSS) attorney because both parents agreed the attorney was not needed. The court noted a statement of decision was not requested but the court's tentative decision would become the statement of decision unless a party objected.

The court stated the following facts were uncontroverted: (1) the November 22, 2005, judgment required Thomas to pay $900 a month in child support; (2) Elizabeth currently earns $17,574 gross per month and pays $326 for health insurance costs; (3) In 2011, Elizabeth paid $911 per month for health insurance including coverage for Thomas; and (4) Elizabeth's monthly income for 2011 was $11,000 and for 2012 was $16,440.

The court stated Father's income was contested for the years 2010 through 2013. "[Thomas's] costs to operate his law office averaged approximately $90,000 per year. [Elizabeth] contends that [Thomas's] net disposable income was unreasonably reduced because he continued to maintain the full law office even when his costs to operate it were too high. [Thomas] contends it is necessary for both appearances and to

6

accomplish the required work in his contingent fee law practice to maintain this level of infrastructure. He claimed annual net disposable income for 2010 of $0; for 2011, $115,000; for 2012, $118,813; [and for the first eight months of] 2013, $95,537."

Citing *In re Marriage of Berger* (2009) 170 Cal.App.4th 1070, 1078 (*Berger*), the court discussed when income can be imputed to a party. The court concluded "in the case before this court, [Thomas] has chosen to reduce the amount of money available for payment of child support as an investment in the infrastructure and continuation of his current law firm which consists of himself alone. His assertions that [Elizabeth] is more efficient in her law firm as a sole practitioner because she is able to accomplish skills he does not maintain does not answer the question at the core of this case. If there was sufficient annual net disposable income for support of the minor child then it must be considered. The court concluded that [Thomas] could not unilaterally and voluntarily arrange his business affairs in such a way as to effectively preclude his child from sharing in the benefits of his current standard of living. The parent does not have the right to divest himself of his earning ability at the expense of the minor child. Therefore, when a parent voluntarily chooses not to maximize his income the court must retain discretion to impute income. If it does not do so then one parent by a unilateral decision could eliminate his or her own responsibility to contribute to the support of the child causing the entire burden of supporting the child to fall upon the other employed parent."

In addition, the court rejected Thomas's argument he was unable to earn any income in 2010. Thomas had claimed he did not earn money because he was required to care for his parents, learn family law to represent himself, and spend time in a case involving his new wife. The court did not explain the basis for its ruling other than to note Thomas's wife was represented by Steven Young.

The court accepted Thomas's argument that his total net disposable income for the years 2010 to 2013 was $329,350, averaging $82,338 per year. "If $90,000 costs

7

are added to $82,338 net, they total $172,338.  The costs are 52.2 [percent] of the gross income.  The amount of $82,338 divided by 12 equals a monthly income amount of $6,866.  Is this the potential for [Thomas]?"

The court summarized the data submitted on Thomas's income and expense declarations and profit and loss statements.  It calculated Thomas's gross profits averaged $25,208 per month based on reported income from 2011 to 2013.  It stated the profit and loss statements showed expenses of approximately 40 to 70 percent.  The court concluded an appropriate expense percentage would be 45 percent "which results in an average of $25,208 x .55 [percent net disposable income] = $13,864 per month."  The court ruled this figure would be used in all the calculations "because it has been relatively consistent throughout the time involved in this matter."

Turning to the dispute over the respective timeshare of each parent, the court noted the original judgment dated 2005 contemplated Thomas would have a 35 percent timeshare.  The court recognized that in 2010 and 2011 Alex was involved in many extra-curricular dance class and competitions with Dance Dynamics in addition to the commercial dance conservatory program at OCSA.  The court noted Father objected to Alex's attendance at OCSA "because of the strain."  The court concluded Alex had "succeeded while attending the school."  Due to Alex's busy schedule, the court determined the timeshare question depended on who could be "credited with the primary physical responsibility of [Alex] while she [was] involved in these various extracurricular activities such as the dance competitions."  The court noted Alex was residing more often with Elizabeth because she lived closer to OCSA, and "the school was previously recommended by Dr. David Mann for Alex."

The court began by accepting the timeshares to which the parties had stipulated, as follows:  (1) for a one-month period from February 21 to March 21, 2012, Alex was with Elizabeth 5 [percent]; (2) during the summer of 2012 the parents shared physical custody 50:50; and (3) Alex was with Elizabeth full time the week before school

8

in August 2012.  The court denied Thomas's request for an additional 10 percent timeshare because it was necessary for him to take time from work to assist Alex with her dancing career.  The court also concluded both parents were not entitled to additional timeshares for reducing their work schedules to assist their daughter.  And it denied additional parenting time for transporting Alex to her various activities.  The court estimated a 13 percent timeshare with Thomas for the school year (from August 2012 to June 2013) because Alex's school and dance schedule meant she was spending more time with Elizabeth.

The court attached DissoMaster printouts that set for the child support orders for period of time between 2011 and 2013.  Specifically, the court calculated Thomas's timeshare and support obligation for the various different time periods at issue as follows:  (1) 35 percent and $651 per month from April 1, through August 30, 2011; (2) 24 percent and $984 per month from September 1, 2011, through February 20, 2012; (3) 95 percent and zero support (and Thomas to receive $1,752 from Elizabeth) from February 21 through March 21, 2012; (4) Zero percent and $350 for the week of March 22, through March 31, 2012; (5) 13 percent and $1,000 per month April 1, 2012, through June 30, 2013; and (6) 20 percent and $1,018 per month starting July 1, 2013, and going "forward."

Thus, to briefly summarize, the original 2005 judgment ordered $900 child support with Thomas having a timeshare of 35 percent, and the 2015 judgment raised ongoing support (as of July 1, 2013), to be $1,018 with Thomas having a lower timeshare of 20 percent.  We wish to make clear, Thomas's appeal concerns the $118 increase in child support, not the reduced timeshare.

In addition, the court also ordered the costs of the OCSA dance program to be shared by the parents "because it appears to be in the best interest for Alex to attend the [s]chool and the parties are able to afford [it]."  The court did not rule on Elizabeth's request for assistance paying for costs incurred by Alex's dance carreer at Dance

9

Dynamics.  The court addressed these issues and provided a more detailed ruling regarding the amount to be reimbursed to Elizabeth in its final judgment, discussed anon.  Thomas's appeal challenges this discretionary add-on.

*C.  Thomas's Request for a Statement of Decision*

On December 20, 2013, Thomas requested a statement of decision explaining the factual and legal basis for the court's determination on several issues, including imputed income, timeshare calculations, and the sharing of public school costs.  He also filed objections to the tentative decision.   Elizabeth filed responses.  On January 24, 2014, the court entered a minute order stating the tentative decision evaluated all the issues requested by Thomas for a statement of decision, and it denied Thomas's objections.  The court clarified the commencement date of the order would be April 1, 2011.  It ordered the tentative statement would serve as the statement of decision.  Thomas filed objections to the statement of decision.

The court entered its final order on February 11, 2014.  In addition to the child support calculations mentioned above, the order contained the following rulings: (1) No party was given credit for transporting Alex to her activities; (2) the court denied Elizabeth's request for reimbursement of one-half of Alex's extracurricular dance activity costs at Dance Dynamics; and (3) the parents would pay one-half of OCSA costs, and because Elizabeth had paid $7,512.50 (representing multiple years), Thomas owed her $3,756.25.  "The net balance of child support and [OCSA] reimbursements owed is the sum of $2,522.64 payable from [Thomas] to [Elizabeth]."

II

Thomas asserts the family court lacked authority to impute income and there was insufficient evidence to support its calculations.  At the hearing, Thomas invited the court to use a net income figure of "$9,500 or $10,000" per month.  The court imputed additional income and arrived at the figure of $13,864 disposable net income per month.  Based on this income amount and evidence Thomas's timeshare with Alex was

10

15 percent less than before, the court increased Thomas's monthly child support obligation from $900 to $1,018 per month. Thomas argues it was improper for the court to consider his "earning capacity" in lieu of actual income because he was gainfully employed and there was no evidence he was deliberately avoiding his support obligation. We conclude there was no abuse of discretion. (*Berger, supra,* 170 Cal.App.4th at p. 1079 [review order modifying child support based on earning capacity for abuse of discretion].)

A. *The Earning Capacity Doctrine*

"We begin with the observation that the statewide uniform guidelines for determining child support rest upon important principles, including (1) '[a] parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life'; (2) '[b]oth parents are mutually responsible for the support of their children'; (3) '[e]ach parent should pay for the support of the children according to his or her ability'; (4) '[t]he guideline seeks to place the interests of children as the state's top priority'; (5) '[c]hildren should share in the standard of living of both parents. Child support may therefore appropriately improve the standard of living of the custodial household to improve the lives of the children'; and (6) '[c]hild support orders in cases in which both parents have high levels of responsibility for the children should reflect the increased costs of raising the children in two homes and should minimize significant disparities in the children's living standards in the two homes.' (. . . § 4053, subds. (a), (b) & (d)-(g).)" (*In re Marriage of Destein* (2001) 91 Cal.App.4th 1385, 1391 (*Destein*).)

"A crucial component for determining the amount of child support is, of course, each parent's income. (. . . §§ 4055, 4059.) 'Income,' itself, is broadly defined: 'The annual gross income of each parent means income from whatever source derived . . . .' (. . . § 4058, subd. (a).) Moreover, the court is not limited to the parent's actual income. 'The court may, in its discretion, consider the earning capacity of a parent in

11

lieu of the parent's income, consistent with the best interests of the children.' (. . . § 4058, subd. (b).)" (*Destein, supra,* 91 Cal.App.4th at p. 1391.)

"The strong public policy in favor of providing adequate child support has led to an expansive use of the earning capacity doctrine in setting the level of support when consistent with the needs of the child. [Citation.] 'Historically, California courts limited consideration of a parent's earning capacity (in lieu of actual income) to the narrow situation where the record demonstrated the parent was deliberately shirking family financial responsibilities by intentionally suppressing income or refusing to accept or seek gainful employment . . . .' [Citations.] . . . Currently, . . . section 4058 expressly authorizes the court to attribute income, without regard to deliberate attempts to reduce income." (*Destein, supra,* 91 Cal.App.4th at pp. 1391-1392.) "'While deliberate avoidance of family responsibilities is a significant factor in the decision to consider earning capacity [citation], the statute explicitly authorizes consideration of earning capacity *in all cases*,' consistent with the child's best interests. [Citations.]" (*In re Marriage of Smith* (2001) 90 Cal.App.4th 74, 81, italics added.)

*In re Marriage of Padilla* (1995) 38 Cal.App.4th 1212, is instructive. In that case the child's father, the supporting party, quit his job to start his own business with the goal of increasing his earnings. There was evidence father's business was in the "start-up" phase, he was self-employed, and he currently did not receive any income. His business was earning $1,500 a month but due to repayment obligations on large business loans the business had a monthly negative cash flow. The trial court imputed income after specifically finding no bad faith motive in the father's actions. The ruling was affirmed on appeal. "Statutory commands and the inherent responsibility parents owe their children lead us to conclude the bad faith rule, as applied to child support . . . can no longer be supported. Once persons become parents, their desires for self-realization, self-fulfillment, personal job satisfaction, and other commendable goals must be considered in context of their responsibilities to provide for their children's reasonable needs. If they

12

decide they wish to lead a simpler life, change professions or start a business, they may do so, but only when they satisfy their primary responsibility:  providing for the adequate and reasonable needs of their children." (*Id.* at p. 1220, fn. omitted.)

Thomas's reliance on *In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075 (*Riddle*), is misplaced.  That court determined the trial court abused its discretion in refusing to accommodate a parent's fluctuating income.  In *Riddle*, the husband, a financial advisor, was compensated depending on the amount of commission earned in a given month. (*Id.* at pp. 1077-1078.)  The trial court calculated husband's pendente lite support obligation using two calendar months of 2003, and that figure differed significantly from the one the court would have reached if had it used a time period anytime in the preceding 12 months. (*Id*. at pp. 1078-1079.)  The court held the calculation of a party's prospective earnings must be based on stable, representative numbers, even where the party's income fluctuates from month to month. (*Id.* at pp. 1081-1082.)  "[T]he time period on which income is calculated must be long enough to be *representative*, as distinct from *extraordinary*." (*Id.* at p. 1082.)  It is an "abuse of discretion to take so small a sliver of time to figure income that the determination essentially becomes arbitrary." (*Id*. at p. 1083 [two months].)  In other words, the *Riddle* court held that when income fluctuates the court must look at a representative time period to assess income.

Thomas does not allege the court failed to look at an appropriate time period.  Indeed, our record shows the court generously took into account a three-year period (2011 to 2013) to account for Thomas's fluctuating income and expenses as a sole practitioner.  Moreover, unlike the husband in *Riddle* who was gainfully employed by a third party as a commissioned financial advisor, the trial court recognized Thomas was self-employed and had the sole decision-making authority over his take home income and necessity for business expenses.

13

Thomas asserts the earning capacity doctrine should not apply when the providing spouse is employed. He is wrong. The court has discretion to impute earnings to the underemployed. "[W]hen a parent voluntarily chooses not to maximize his income, 'the court must retain discretion to impute income'; if it does not, '"one parent by a unilateral decision could eliminate his or her own responsibility to contribute to the support of the child[ren] . . . ." [Citation.]' [Citation.]" (*Berger, supra,* 170 Cal.App.4th at p. 1083.) "So long as a parent has an earning capacity, that is, the ability and the opportunity to earn income, the trial court may attribute income. [Citation.]" (*Destein, supra,* 91 Cal.App.4th at p. 1392.)

For example, in "*In re Marriage of Hinman* [(1997)], 55 Cal.App.4th [988,] 999, the court refused to adopt 'a per se rule prohibiting the imputation of income to parents who refrain from employment in order to care for preschool-age children.' In *In re Marriage of Dacumos* (1999) 76 Cal.App.4th 150, 153-154 . . ., the supporting party argued that it was an abuse of discretion to impute income to certain income-producing rental properties, because '"earning capacity" is limited to income derived from employment and does not include imputed rental income.' The court rejected this contention. Noting that income is broadly defined without regard to its source (. . . § 4058, subd. (a)), the court applied the earning capacity doctrine to the ability to earn from capital as well as labor. (See also *County of Kern v. Castle* (1999) 75 Cal.App.4th 1442, 1455 [earning capacity applied when father spent entire $240,000 inheritance and failed to invest it].)" (*Destein, supra,* 91 Cal.App.4th at pp. 1392-1393 [trial court imputed rate of return to certain no income producing real estate assets].)

B. *Standard of Review*

"A trial court's decision to impute income to a parent for child support purposes based on the parent's earning capacity is reviewed under the abuse of discretion standard. [Citations.] 'Under this standard, "[t]he appellate court should not substitute its own judgment for that of the trial court; it should determine only if any judge

14

reasonably could have made such an order. [Citation.]" [Citation.]' [Citation.]" (*Destein, supra,* 91 Cal.App.4th at p. 1393.) "[W]e consider only 'whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion.' [Citation.] . . . '[W]e do not substitute our own judgment for that of the trial court, but determine only if any judge reasonably could have made such an order.'" (*Berger, supra,* 170 Cal.App.4th at p. 1079.)

*Berger, supra,* 170 Cal.App.4th 1070 is instructive. There, the former husband (Marc), left his $600,000 salary job at an accounting firm to devote his full time to working as president of a landscape business in which he owned an equity interest. (*Id.* at p. 1075.) When the landscape business experienced financial difficulties, Marc agreed to defer his salary, and then sought modification of his child support obligation. (*Ibid.*) The trial court determined Mark derived no income from the business and imputed a meager income of $3,168 based on a theoretical return of 4.5 percent of his many assets. Based on this calculation, the trial court drastically reduced child support. (*Id*. at p. 1078.) On appeal, the court reversed, holding the trial court "abused its discretion in deciding those circumstances warranted an order that essentially granted Marc a 'holiday' from any significant responsibility to support his family at the present time." (*Id.* at p. 1081.) It reasoned, "By agreeing to defer his salary to preserve his company's capital, Marc is, in effect, investing in the company. He's agreeing to take no income now, with the expectation that if the company's fortunes later improve, he will be compensated with additional equity. And he is funding that choice by relying upon his other assets to support his living expenses. But Marc could have just as easily chosen to retain his salary—which after all, he needs to support himself—*and his family*— and instead utilize his *other assets* to fund monthly capital investments into his company." (*Id.* at p. 1082.) The court concluded, "Marc cannot unilaterally, and voluntarily, arrange his business affairs in such a way as to effectively preclude his children from sharing in the benefits of his *current* standard of living." (*Ibid.*)

15

## C. Imputing Income to Thomas's Business

Thomas asserts it was improper to use earning capacity in lieu of actual income because he was clearly gainfully employed and there was no evidence he was deliberately avoiding his support obligation. As we explained in greater detail above, the earning capacity doctrine may be applied to self-employed parents and is not dependent of evidence of bad faith. As aptly stated by our Supreme Court, "We . . . decline to read into . . . section 4058, subdivision (b), any limitation on the discretion vested in the trial court to consider earning capacity in determining the appropriate amount of child support when doing so would be in the child's best interests." (*Moss v. Superior Court* (1998) 17 Cal.4th 396, 424.)

Before we begin the analysis, it is helpful to review the nature of motions pending before the court. Thomas filed a motion in March 2011 to reduce his support obligation based on the allegation he was no longer earning any income and was in debt. Eight months later, in December 2011, Elizabeth filed a motion seeking reimbursement of several child-related expenses. Two years later, in March 2013, Elizabeth filed a motion seeking an increase in child support because Alex was residing with her 100 percent of the time. Elizabeth also suggested the court should impute income to Thomas because Thomas was living in a mansion and it appeared Thomas was minimizing his income and living off other assets.

Starting with the first motion, the court determined Thomas failed to meet his burden of proving his child support obligation should have been reduced due to his law firm's financial difficulties. The court stated it found "unpersuasive" Thomas's contention the year was unprofitable due to factors beyond his control, i.e., he was distracted by litigation with Elizabeth, his wife's lawsuit against Disneyland, and caring for his parents. On appeal, Thomas does not assert this finding was an abuse of discretion. Rather, Thomas argues that it appears the court unfairly "penalized" him for his one unprofitable year by using a "$0 income" figure for one year in calculating

16

whether to impute income. We conclude the evidence was relevant and fairly considered by the court as just one component of the bigger financial picture of the law firm's profit/loss ratios.

Specifically, Thomas's profit and loss statements show expenses exceeded gross profits by $5,000 per month in 2010 resulting in zero net disposable income. In later years, Thomas reported expenses that were sometimes as high as 70 percent of gross profits and could be as low as 40 percent. We conclude all the financial reports were relevant to the court's evaluation of the fluctuating profit/loss ratios of the law practice and to whether Thomas was voluntarily minimizing his net income and, thereby, also negatively affecting his ability to support Alex. Thus, the court's recognition there was a significant negative cash flow for an entire year, and no adjustment of expenses, was not to penalize Thomas unfairly. It was relevant evidence to address Elizabeth's claim the court should impute income to an underemployed spouse.

We turn our attention next to the issue of whether the court abused its discretion in deciding to impute income. In its ruling, the court stated Thomas's net income was entirely dependent on his investment and business decisions and there was evidence he voluntarily arranged his business affairs to minimize his disposable net income. The court concluded there was also evidence Thomas had access to additional income to support Alex and consideration of his earning capacity was, therefore, consistent with her best interest. We conclude these conclusions were supported by Thomas's income and expense declarations and other evidence regarding Thomas's lifestyle, i.e., Thomas and his wife resided in an expensive guard-gated private community, Coto de Caza, in Orange County. The court reasonably relied on reports showing that from 2011 to 2013, Thomas's gross yearly income ranged from approximately $260,000 to $306,000. It calculated an average monthly gross income of $25,208. The court reasoned that based on Thomas's station in life, somewhat

17

extravagant lifestyle, and gross income, Thomas's had access to more than his self-reported $9,000 to $10,000 net disposable income per month.

Because Thomas's net disposable income from his law practice was solely dependent on the amount Thomas allocated towards business expenses, the court properly focused on this factor. It considered that Thomas arranged his business costs to completely exceed his income for one full year, and in later years, his expenses were sometimes as high as 70 percent of the gross income. Because the reported expenses varied month to month (somewhere between 40 to 70 percent), the court calculated an average for a three-year period: The monthly expenses averaged 52 percent of the gross income (leaving only 48 percent in profits). The court heard both parties testify at the hearing regarding the necessity of some of Thomas's reported expenses, such as Thomas's legal secretary costing $90,000 a year, the file clerk, the office space lease and overhead, and other "infrastructure" costs. We cannot reweigh the evidence or review the court's credibility findings. Based on the evidence and testimony regarding the high level of business expenses, the court reasonably concluded Thomas could have adjusted his costs to benefit from a larger profit margin than 48 percent. We find no basis to reject the court's conclusion of a need to impute income based on the evidence presented.

However, the same cannot be said of the court's conclusion a more reasonable profit margin was 55 percent rather than 48 percent. In setting this new profit/loss ratio, the trial court provided no explanation for essentially decreasing the monthly average expenses from the current rate of 52 percent to 45 percent (a seven percent reduction in business costs) in order to achieve the 55 percent profit margin. The trial court cannot calculate imputed income based on figures taken "from thin air." (*In re Marriage of Cohn* (1998) 65 Cal.App.4th 923, 931.)

We find instructive the body of case law examining the evidence required for a lost profits award. Like the issue of what is an appropriate profit margin for Thomas, the lost profit inquiry is somewhat speculative. For this reason, courts have held

18

lost profit damages requires evidence that ""makes reasonably certain their occurrence and extent." . . . "In some instances, lost profits may be recovered where plaintiff introduces evidence of the profits lost by similar businesses operating under similar conditions. [Citations.]"' [Citation.]" (*Asahi Kasei Pharma Corp. v. Actelion Ltd.* (2013) 222 Cal.App.4th 945, 968-969.) ""While lost profits can be established with the aid of expert testimony, economic and financial data, market surveys and analysis, business records of similar enterprises and the like, the underlying requirement for each is '"a substantial similarity between the facts forming the basis of the profit projections and the business opportunity that was destroyed."'" [Citation.]' [Citation.]" (*Id.* at p. 969.)

We have carefully reviewed the record and neither party submitted evidence showing Thomas's expenses were substantially similar to or different from other similar law practices. We believe the appropriate profit loss margin for an established 26-year-old law firm is a complex financial issue requiring a greater degree of training, skill, and business model expertise that is possessed by most laypersons. We could only speculate about whether it was reasonable for Thomas to continue paying over $2,000 a month to rent office space, over $1,000 in automobile expenses, and over $8,000 a month in personnel expenses, when Thomas's take-home pay was sometimes less than the base pay of his legal assistant. On remand, the court may appoint a forensic accountant or other financial legal expert to evaluate Thomas's desired business model to continue earning less than 50 percent of his gross income. An expert would be better equipped to consider the big picture as well as the more detailed examination of the expenses paid directly by the business. The profit and loss statements provided to the court contain broad categories of expenses such as "other office expenses" that may be approved or reallocated by an expert as income to Thomas for purposes of calculating child support.

19

We recognize there is an expense associated with hiring a forensic expert or business analyist.  The parties will have to decide if it is worth the expense to quibble over an additional $118 of child support per month as Alex nears her 18th birthday.

*D.  Discretionary Add-On for Activities*

In her 2011 motion, Elizabeth sought reimbursement for half of Alex's dance-related expenses ($3,000) charged by her dance studio for participation on the competition team.  Elizabeth also asked for Thomas to pay a portion of health insurance and child care expenses, including after school transportation.  In addition, Elizabeth requested reimbursement for Thomas's share of the voluntary parent cash contribution donated to Alex's dance conservatory at her charter high school, OSCA.  The court denied all the requests except for the last one.  The court determined each parent would pay one half of the cash donation Elizabeth paid to OCSA.  Because Elizabeth had paid $7,512 over multiple years, the court calculated Thomas must reimburse her $3,756.  On appeal, Thomas objects to this add-on, arguing the court had no authority to impose payments because the law guarantees Alex receive a free public education.

We begin by noting Thomas devotes five pages of his brief to discussing general principles of law related to public education.  In short, he discusses authority holding student fees for extracurricular activities cannot be imposed by public school districts.[4]  However, OCSA is a charter school.  Noticeably missing from the discussion is whether this is a distinction that makes a difference, i.e., to what extent does public school law apply to charter schools.  When an appellant raises an issue "but fails to support it with reasoned argument and citations to authority, we treat the point as waived.

---

[4]  Thomas repeatedly asserts Alex's dance classes were part of her "curricular activities" not extracurricular activities, but he also argues extracurricular activities should be part of free public education.  It is unclear what point he is trying to make.  His case authority holds *a public school* must offer both types of activities free of charge and he provides no case authority that the distinction, curricular vs. extracurricular, matters in charter schools such as OCSA.

[Citations.]" (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785.) An appellant may not simply make an assertion of law on one subject and leave it to the appellate court to figure out why it applies to the case at hand.

Our record shows Alex's academic education was entirely free. She did not have to pay any extra money for her math or history classes. Her parents could have donated cash to "bridge the gap" between what the state provided the school and what the school actually must spend for each student's academic classes, but Elizabeth did *not* donate to OCSA "academic support program." She made a donation to help pay directly for Alex's dance conservatory program, i.e., Alex's dance education at OCSA.

OCSA is a special charter school that offers students the opportunity to participate in 12 different art conservatory programs, each one entirely funded by cash donations and not by the state. Alex was accepted into the commercial dance conservatory (CMD). Elizabeth executed a parent agreement voluntarily agreeing to donate money to help pay for CMD's dance instruction and other program costs.

Specifically, Elizabeth presented evidence Alex's charter school required the parents each year to execute a "parent funding agreement" regarding their child's arts conservatory program. The agreement asked the parents to indicate if they would make a cash contribution to their "student's arts conservatory" and provided a suggested amount. There was a space on the form agreement where Elizabeth could indicate her voluntary donation (which could be less or more than the suggested amount). For example, parents could make a larger donation to sponsor a student with financial need. The agreement also asked parents to consider paying an additional $480 for the "academic support program–'bridge the gap.'" This cash contribution was earmarked as being "towards academics." The parent was then asked to subtotal the "Arts Conservatory + Academic Cash Contributions."

The next section of the agreement provided the parent with several payment plans (one time, quarterly, or monthly payments), or the option of participating in

21

fundraisers to raise money for the amount designated by the parent in the agreement. Fundraising included selling advertising in programs or selling opportunity drawing tickets. The final section of the agreement requested that the parent(s) initial three items and then sign their name on the last line. The three listed items are as follows: (1) "I understand that my student's arts conservatory program is not funded by the State of California and that conservatory budgets are based solely on parent commitments of cash donations and fund-raising activities"; (2) "I understand all cash donations are tax deductible as provided by law"; and (3) "I understand my commitment is voluntary and not required for my child to participate in any conservatory or academic programs."

The first item of the list above highlights the allocation of public funding is different between charter school and public schools. OCSA, unlike a public school, does not receive funding from the state to run its arts conservatory programs. In the agreement, OCSA formulates its budget for the dance teacher salaries and dance classes based on the amount of money the parents committed to donating in the beginning of each school year. In summary, the donation is voluntary, but the agreement provides that once a parent makes the commitment to pay OCSA, the CMD conservatory will be counting on the money to fund its dance program.

Based on the above evidence, we conclude Thomas's free public school argument is a red herring. Alex is not attending a public school and Thomas cannot assert he is being forced by OCSA to pay money for a public education. Thomas provides no case authority holding it is illegal for a charter school to seek voluntary donations to fund its art classes.

The real issue can be simply stated as follows: Did the court abuse its discretion in ordering Thomas to reimburse Elizabeth for money paid to support Alex's dance program. We find no abuse of discretion.

Section 4062 "makes discretionary ('the court may order') additional child support for educational or special needs of a child or for travel expenses for visitation.

22

Among the family law bench and bar, these are usually referred to as . . . discretionary add-ons." (*In re Marriage of Fini* (1994) 26 Cal.App.4th 1033, 1039, fn. omitted (*Fini*).) Section 4061 provides, "The amounts in [s]ection 4062, [if ordered to be paid,] shall be considered additional support for the children and shall be computed in accordance with the following:  [¶] (a) If there needs to be an apportionment of expenses pursuant to [s]ection 4062, the expenses shall be divided one-half to each parent, unless either parent requests a different apportionment pursuant to subdivision (b)[,] and presents documentation which demonstrates that a different apportionment would be more appropriate."  Consistent with its broad authority to mitigate a decline in the children's standard of living postdissolution, a court has broad discretion regarding the type of expenses it may award as discretionary add-ons, including a wide variety of extracurricular activities and educational expenses. (*In re Marriage of Schlafly* (2007) 149 Cal.App.4th 747, 760-761.)

Thomas signed a stipulation agreeing it was in Alex's best interests to attend OCSA.  The court accepted the stipulation and entered an order on April 11, 2011, stating Alex's parents agreed she should attend OCSA.  Four years later, Thomas now asserts Elizabeth was untruthful in 2011 about the potential costs associated with attendance.  Given the high level of acrimony between the parties, and years of contentious litigation, it is difficult to believe Thomas would have voluntarily stipulated to such an important educational decision for Alex without first determining for himself the potential financial consequences.  He does not contend the information was unavailable to him, he was precluded from contacting the school, or he was prevented from attending the school orientation/registration days for the past four years of school.  For these reasons, we find unpersuasive Thomas's contention the trial court's discretionary add-on order must be reversed based on principles of equitable estoppel.

We also reject Thomas's argument he cannot be forced to share in the costs of Elizabeth's voluntary donation made on a whim.  The contention misstates the record.

23

Whether the CMD program is deemed curricular or extracurricular it does not change the fact Alex's dance program was not funded by the state. Although Elizabeth was under no legal obligation to execute OCSA's parent funding agreement, we agree with Elizabeth's contention she did not make the donation on a "whim." Elizabeth was not donating money to her favorite children's charity. As plainly stated in OCSA's parent funding agreement, the donation directly paid for costs associated with Alex's dance program for Alex's direct benefit. As explained by the agreement, CMD's budget was based solely on the amount of parent donations and fund raising activities. If not enough parents donated money there would likely be budgetary cuts made to the program. The family court stated attending the dance program was in Alex's best interests, recognizing the donation helped insure Alex was provided a fully funded dance program.

In its order, the court did not specify whether the discretionary add-on (of approximately $1,500 per year) was for the "educational or special needs of a child." It simply ruled the dance program was in Alex's best interest and the parents could afford it. The court also acknowledged, during its timeshare determination, OCSA was recommended by Alex's therapist. Thomas overlooks that the court order can be based on Alex's special needs rather than on additional educational costs. He does not dispute that Alex's attendance at OCSA was in her best interest given her special needs (her special needs were discussed and litigated extensively in *Nigro I*), nor does he dispute he has the ability to pay. We conclude that although the CMD conservatory takes place on a school campus, its physical location does not preclude the court from exercising its discretion and concluding the program was necessary to meet Alex's special needs.

III

The postjudgment order is affirmed in part and reversed in part. The child support order is reversed and remanded to permit additional evidence and testimony relevant to an earning capacity calculation. We affirm the order reimbursing Elizabeth

24

$3,756 for the OCSA dance conservatory program. Respondent (Elizabeth) shall recover her costs on this appeal.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


FYBEL, J.